IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALFREDO BELTRAN; DANIEL WANNER; and BETTER DAYS AHEAD OUTREACH INC. | : : : | |
| | : | Case No. 2:23-cv-04234 |
| Plaintiffs, | : : | JURY TRIAL DEMANDED |
| vs. | : : | |
| BOROUGH OF POTTSTOWN, | : : | |
| Defendant. | | |

**PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

Plaintiffs Alfredo Beltran and Daniel Wanner (together, "Unhoused Plaintiffs"), along with Plaintiff Better Days Ahead Outreach Inc. ("Better Days Ahead"), move this Court to enter a preliminary injunction enjoining Defendant Borough of Pottstown from closing the homeless encampment in which Unhoused Plaintiffs reside on Borough of Pottstown-owned land next to the Schuylkill River Trail along College Drive, Pottstown, PA (the "College Drive Encampment"), unless and until Defendant genuinely offers all of the College Drive Encampment residents with adequate alternative shelter.

As explained in the Complaint filed in this action, Defendant Borough of Pottstown's threatened conduct with respect to the College Drive Encampment violates its citizens' constitutional rights to be free from cruel and unusual punishment and state created dangers. This Court's issuance of a preliminary injunction will ensure that no irreparable harm is done to Plaintiffs, including the violation of Plaintiffs' constitutional rights and Unhoused Plaintiffs'

forced relocation from the College Drive Encampment without any other offer of alternative shelter, while this case is pending.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Background on Homelessness in the Borough of Pottstown

#### 1.   *Size of the unhoused community*

Inflation in the wake of the COVID-19 pandemic and other factors have spawned an affordable housing crisis in the Borough of Pottstown and throughout Montgomery County and Southeastern Pennsylvania.  This affordable housing crisis and other factors have caused an increase in homelessness in Montgomery County, Pennsylvania, with a large portion of Montgomery County's unhoused population residing in the Borough of Pottstown.  *See* Homeless Taskforce April 24, 2023 Powerpoint at 6-7, Ex. A.

Specifically, according to data collected by Montgomery County, approximately 568 people were unhoused in Montgomery County during its January 2022 point-in-time count—more than double the number of unhoused people that it counted in January 2021.  *Id.* at 6. While the point-in-count number decreased to 329 unhoused people in January 2023, that number remains higher than in any previous count from 2017 to 2021.  *Id.* at 6.

Within the Borough of Pottstown, during the January 2023 point-in-time count, Montgomery County located approximately forty-one (41) unhoused residents living outside, excluding unhoused Pottstown residents staying in emergency or other temporary shelter housing on the night of the count.  *Id.* at 7.  Area non-profits serving the Borough of Pottstown unhoused community estimate that approximately seventy-five (75) to ninety-five (95) unhoused residents in total live in the Borough of Pottstown right now.  Aff. of M. Boorse at ¶ 5, Ex. B; Aff. of T. Niarhos at ¶ 4, Ex. C.

2. *Lack of emergency shelter*

The Borough of Pottstown and Montgomery County more broadly do not have enough shelter beds to house the Borough of Pottstown's unhoused residents.  Most importantly, in June 2022, the Coordinated Homeless Outreach Center in Norristown—the only year-round homeless shelter for single adults in all of Montgomery County—closed, eliminating the primary shelter option for most Montgomery County unhoused residents.  Aff. of M. Boorse at ¶ 10, Ex. B. Although Montgomery County is providing a limited number of hotel stays in place of the Coordinated Homeless Outreach Center, the program has a lengthy waitlist, with most unhoused residents needing to wait approximately three to six months for emergency shelter.  *Id.* at ¶ 11.

Likewise, Beacon of Hope, a church-based warming center program in the Borough of Pottstown, offers up to thirty-five (35) overnight warming beds on a first-come, first-served basis from November 1 to May 1 each year, but these beds are not nearly enough to meet the need for shelter in the Pottstown community.[1]  Aff. of T. Niarhos at ¶¶ 7-8, Ex. C.  From December 2022 to March 2023, Beacon of Hope typically had to turn away three to eight unhoused people each night, except during nights in which the temperature dropped to 20°F or below with a windchill factor, during which times Montgomery County opened up additional shelter options under its "Cold Blue" program.  *Id.* at ¶ 8.  As explained further in Section II(B) below, Beacon of Hope's capacity will be even lower for part of this upcoming winter due to roadblocks put up by Defendant Borough of Pottstown.

---

[1] The warming bed program is not a true shelter program because residents can stay overnight for only approximately fourteen (14) hours.  Aff. of T. Niarhos at ¶ 6, Ex. C.  During the daytime, unhoused residents must go elsewhere.  *Id.*  As the warming center operates on a first come, first-served basis, obtaining a bed at the warming center on one night does not guarantee a bed on future nights.  *Id.* at ¶ 5.

**B.  Defendant Borough of Pottstown's Response to Homelessness**

Defendant Borough of Pottstown has taken an increasingly aggressive stance towards unhoused residents over the past two years, despite the fact that most unhoused residents are outside because they cannot obtain shelter housing.  Specifically, the Pottstown Police Department ("Pottstown PD"), which is part of Defendant Borough of Pottstown, has repeatedly conducted sweeps of homeless encampments in the Borough of Pottstown over the past two years.  Aff. of A. Beltran at ¶ 7, Ex. D; Aff. of M. Boorse at ¶ 22, Ex. B.  During these sweeps, Defendant Borough of Pottstown, via the Pottstown PD, has ordered unhoused residents to relocate without any offer of alternative housing, typically forcing residents to relocate to other, less safe outdoor spaces.  Aff. of A. Beltran at ¶¶ 7-8, Ex. D; Aff. of M. Boorse at ¶ 23, Ex. B.

At the same time that Defendant Borough of Pottstown has taken an increasingly aggressive stance towards its unhoused residents, Defendant Borough of Pottstown has also sought to block or impede Beacon of Hope from providing overnight warming beds to unhoused residents.  Most importantly, in 2022, the Borough of Pottstown issuing a cease and desist letter to Beacon of Hope, demanding that Beacon of Hope stop providing overnight warming beds to the unhoused community.  Aff. of T. Niarhos at ¶ 9, Ex. C.  In defense of this position, the Borough of Pottstown issued a press release on December 7, 2022, stating that its "Zoning Ordinance does not permit homeless shelters to operate within the Borough."  Borough of Pottstown, Press Release, Dec. 7, 2022, Ex. E.

The Borough of Pottstown's attempts to curtail Beacon of Hope's ability to provide bedspace will further reduce warming beds available during part of this upcoming winter.  Specifically, Beacon of Hope, which ordinarily attempts to make thirty-five (35) shelter beds available from November 1 to May 1, will need to rotate each month among five different

churches during the 2023 to 2024 shelter season to avoid the Borough of Pottstown demanding that the program shut down.  Aff. of T. Niarhos at ¶¶ 10-11, Ex. C.  As the result of needing to rotate among five different churches, Beacon of Hope will be based out of a church in January 2024—one of the coldest months of the year—that will have only up to twenty-seven (27) beds available rather than the usual thirty-five (35).  *Id.* at ¶ 12.  The reduction to twenty-seven beds almost certainly means that Beacon of Hope will need to turn away even more unhoused residents this upcoming winter than it did during the 2022-2023 winter.

**C.  Planned Closure of the College Drive Encampment**

Due to the lack of affordable housing or emergency shelter in the Borough of Pottstown and Montgomery County more broadly, approximately twenty-five (25) unhoused Pottstown residents, including Unhoused Plaintiffs, currently live at the College Drive Encampment, located on Borough of Pottstown-owned land adjacent to the Schuylkill River Trail.  Aff. of M. Boorse at ¶ 5, Ex. B.  Being together at the College Drive Encampment provides Unhoused Plaintiffs and other residents of the encampment with safety, mutual support, and access to life-sustaining social services.  Aff. of A. Beltran at ¶¶ 6, 11, Ex. D; Aff. of D. Wanner at ¶¶ 6, 11, Ex. F.

In or around August 2023, the Borough of Pottstown, via the Pottstown PD, confirmed to Access Services, a social services agency that provides assistance to unhoused residents in Pottstown, that the Pottstown PD would be closing the College Drive Encampment, and that all unhoused residents at the encampment would need to relocate.  Aff. of M. Boorse at ¶ 12, Ex. B.  The Pottstown PD further informed Access Services that it would be warning unhoused residents that they may be arrested for trespass if they stay at the College Drive Encampment after its closure.  *Id.* at ¶ 13.

On September 28, 2023, Officer Guth of the Pottstown PD informed Access Services, Plaintiff Beltran, and another College Drive Encampment resident that Defendant Borough of Pottstown would be closing the College Drive Encampment in or around November or December 2023.  *Id.* at ¶ 14; Aff. of A. Beltran at ¶ 17, Ex. D.  Officer Guth stated that the reason that Defendant Borough of Pottstown would be closing the College Drive Encampment was to clear trees from Borough of Pottstown-owned land along the Schuylkill River Trail and to plant grass instead.  Aff. of M. Boorse at ¶ 15, Ex. B; Aff. of A. Beltran ¶ 18, Ex. D.  Officer Guth made no offer of alternative housing to Plaintiff Mr. Beltran or to the other College Drive Encampment Resident, instead encouraging them to relocate to private property or other outdoor spaces owned by entities other than Defendant.  Aff. of M. Boorse at ¶ 16, Ex. B; Aff. of A. Beltran at ¶ 19, Ex. D.

On or around October 2, 2023, Defendant Borough of Pottstown informed Access Services and Beacon of Hope during a meeting that it would close the College Drive Encampment in or around December 2023.  Aff. of M. Boorse at ¶ 17, Ex. B; Aff. of T. Niarhos at ¶ 13, Ex. C.  During the October 2, 2023 meeting, Defendant Borough of Pottstown requested that Access Services and Beacon of Hope help the College Drive Encampment residents to find alternative housing and that Beacon of Hope prioritize displaced College Drive Encampment residents for warming beds.  Aff. of M. Boorse at ¶ 18, Ex. B; Aff. of T. Niarhos at ¶¶ 14, 16, Ex. C.  Access Services and Beacon of Hope explained to Defendant Borough of Pottstown that it would be impossible for them to help the residents find shelter housing because there is not adequate shelter space available to house all of the College Drive Encampment residents.  Aff. of M. Boorse at ¶ 19, Ex. B; Aff. of T. Niarhos at ¶ 15, Ex. C.  Beacon of Hope further stated that it could not prioritize displaced College Drive Encampment residents because doing so would

prevent other unhoused residents from receiving warming beds.  Aff. of T. Niarhos at ¶ 17, Ex. C.  Despite Access Services and Beacon of Hope explaining that the College Drive Encampment residents would have nowhere else to go, Defendant Borough of Pottstown indicated that it would go forward with the College Drive Encampment closure anyway.  Aff. of M. Boorse at ¶ 20, Ex. B; Aff. of T. Niarhos at ¶ 18.

In October 2023, Defendant Borough of Pottstown put up yellow signs warning College Drive Encampment residents that "[y]ou are NOT permitted to enter or use this property . . . for any reason . . . such as to erect a tent, encampment or other structure, or to otherwise live, sleep, stay or store belongings on this property after December 1, 2023."  October 2023 Sign to College Drive Encampment Residents, Ex. G.  The yellow signs also state "NO TRESPASSING," and instruct College Drive Encampment residents to call 211 or the Montgomery County Mobile Crisis "[i]f [they] need help finding alternative shelter."  *Id.*  The signs further state that Beacon of Hope will have shelter spaces available beginning November 1, 2023.  *Id.*

The signs' instructions for accessing alternative shelter, however, are misleading and will not enable most College Drive Encampment residents to access shelter.  Specifically, dialing 211 connects callers to a call center for Montgomery County residents experiencing homelessness.  But because Montgomery County has no shelter beds to offer right now, as explained in Section II(A) above, the operators of the 211 system cannot connect callers to immediate shelter right now and can typically do nothing more than place unhoused residents on a roughly three to six-month waitlist for a hotel bed, depending on the resident's vulnerability factors.  Aff. of M. Boorse at ¶ 11, Ex. B.  Likewise, as described above, Beacon of Hope does not have sufficient capacity to offer warming beds to all of the College Drive Encampment residents, and the

Borough of Pottstown listed it as a shelter option without the organization's consent.  Aff. of T. Niarhos at ¶¶ 21-22, Ex. C.

The reality instead is that many or most of the College Drive Encampment residents will have no choice but to relocate to other outdoor spaces during the middle of winter.  Aff. of M. Boorse at ¶ 23, Ex. B.  Indeed, recognizing this reality, Officer Guth explicitly encouraged Plaintiff Mr. Beltran and another College Drive Encampment resident to relocate to other outdoor spaces.  *Id.* at ¶ 16; Aff. of A. Beltran at ¶ 19, Ex. D.  Forcing Unhoused Plaintiffs and other College Drive Encampment residents to relocate to other outdoor spaces at the beginning of winter will undoubtedly threaten their health, safety, and wellbeing, as described further below.

**D.  Impact on Plaintiffs**

   1. *Impact of the proposed College Drive Encampment closure on Unhoused Plaintiff Mr. Alfredo Beltran*

Unhoused Plaintiff Alfredo Beltran became unhoused in or around 2022 and has been living at the College Drive Encampment since in or around 2023.  Aff. of A. Beltran ¶¶ 3-4, Ex. D.  Prior to living at the College Drive Encampment, the Pottstown PD ordered him to relocate from at least one other encampment.  *Id.* at ¶ 7.  Mr. Beltran was also ordered to relocate from another location just outside of Pottstown.  *Id.*  These forced relocations were difficult for Mr. Beltran because many of his belongings were damaged in the process, and he had to find somewhere else to live.  *Id.* at ¶ 8.

Mr. Beltran fears that if Defendant Borough of Pottstown sweeps the College Drive Encampment, he will need to find another outdoor space in which to live because no shelter is available to him right now.  *Id.* at ¶¶ 9-10.  Living at the College Drive Encampment also provides Mr. Beltran with greater safety and security, including greater protection from crime, as

well as social connections and the ability to more easily access social services.  *Id.* at ¶¶ 6, 11.
Such social services include medical visits from the Street Medicine program and access to food
and other life-sustaining supplies from Plaintiff Better Days Ahead.  Aff. of M. Boorse at ¶¶ 6,
23, Ex. B; Aff. of C. Brickhouse at ¶¶ 5, 11, Ex. H.

If Defendant Borough of Pottstown closes the College Drive Encampment, Mr. Beltran is
afraid that he will be less safe and at greater risk of crime, especially theft.  Aff. of A. Beltran at
¶ 11, Ex. D.  Mr. Beltran also fears that he will lose the support he receives from other unhoused
residents at the encampment, and service providers fear that encampment residents like Mr.
Beltran will experience disruptions in the continuity of medical care and the provision of food
and other supplies.  *Id.* at ¶¶ 6, 11; Aff. of M. Boorse at ¶¶ 6, 23, Ex. B; Aff. of C. Brickhouse at
¶¶ 5, 11, Ex. H.

At the College Drive Encampment, Mr. Beltran has his tent, clothes, bedding, stove, and
heater.  Aff. of A. Beltran at ¶ 12, Ex. D.  Mr. Beltran fears that he may lose or be separated from
some or all of his property if he is forced to relocate.  *Id.* at ¶ 13.  In particular, Mr. Beltran needs
his tent to stay sheltered.  *Id.* at ¶ 14.  If his tent is taken away, he will be unprotected from the
elements, including rain and cold weather.  *Id.* at ¶ 14.  Likewise, Mr. Beltran also needs his
bedding to have a place to sleep, clothing so that he can change his clothes, and his heater to stay
warm.  *Id.* at ¶¶ 15-16.

2. *Impact of the proposed College Drive Encampment closure on Unhoused Plaintiff
   Mr. Daniel Wanner*

Unhoused Plaintiff Daniel Wanner became unhoused in or around November 2022 and
has been living at the College Drive Encampment since in or around the summer of 2023.  Aff.
of D. Wanner at ¶¶ 3-4, Ex. F.  Mr. Wanner cannot afford housing because he has a disability

that prevents him from working and cannot access emergency shelter because there are not adequate shelter spaces available.  *Id.* at ¶¶ 5, 10.

Mr. Wanner was previously ordered to relocate twice from in or around the site of the former Stanley G. Flagg Co. property, located along the border of Pottstown and West Pottsgrove.  *Id.* at ¶ 7.  Mr. Wanner struggled to move his property during these past relocations and lost many of his belongings in the process.  *Id.* at ¶ 8.

If Mr. Wanner is ordered to relocate from the College Drive Encampment, he will need to find another outdoor space in which to live because he cannot afford housing and there is no emergency shelter available right now.  *Id.* at ¶ 9.  Defendant Borough of Pottstown closing the College Drive Encampment would also put Mr. Wanner at greater risk of crime and would cause him to lose the support he receives from other unhoused people at the encampment.  *Id.* at ¶ 11. Like Mr. Beltran, he will also be further from the social services that he needs to survive.  *Id.*

Mr. Wanner also has his tent, clothes, bedding, and family photographs at the College Drive Encampment.  *Id.* at ¶ 12.  Mr. Wanner fears that he will be separated from some or all of his property if he is forced to relocate.  *Id.* at ¶ 13.  Most importantly, Mr. Wanner needs his tent to stay sheltered.  *Id.* at ¶ 14.  If his tent is taken away, he will be unprotected from the elements, including rain and cold weather.  *Id.*  Mr. Wanner also needs his bedding to have a place to sleep and clothing so that he can change his clothing and stay clean.  *Id.* at ¶ 15.

### 3. *Impact on Plaintiff Better Days Ahead*

Plaintiff Better Days Ahead is a non-profit organization with a mission of aiding unhoused residents in Pottstown and other Southeastern Pennsylvania municipalities, including by distributing food and supplies to unhoused residents at the College Drive Encampment.  Aff. of C. Brickhouse at ¶¶ 3-5, Ex. H.  Volunteers from Better Days Ahead visit the College Drive

Encampment approximately twice per month to distribute food, tents, clothing, and other critical supplies to the encampment residents. *Id.* at ¶¶ 4-5. Per Plaintiff Better Days Ahead's estimate, approximately half of unhoused Pottstown residents rely on tents that Better Days Ahead supplied to them to stay sheltered. *Id.* at ¶ 7.

Past sweeps by Southeastern Pennsylvania municipalities have frustrated Better Days Ahead's mission by making it much more difficult for Better Days Ahead to locate the unhoused residents that it serves. *Id.* at ¶ 9. They also required Better Days Ahead to divert resources by forcing Better Days Ahead to supply unhoused residents subject to the sweeps with new tents. *Id.* at ¶ 10.

Likewise, if Defendant Borough of Pottstown goes forward with its plan to close the College Drive Encampment without offering residents alternative housing, it will cause irreparable harm to Plaintiff Better Days Ahead by scattering the College Drive Encampment residents and making it much harder for Plaintiff Better Days Ahead to find and aid the unhoused residents that it serves. *Id.* at ¶¶ 11-12. Without the life-sustaining supplies, such as food, sleeping bags, and tents, that Plaintiff Better Days Ahead provides, residents may be at immediate risk of hunger and/or exposure to the cold. *Id.* at ¶¶ 6, 13.

### E. Procedural History

Plaintiffs filed their Complaint on November 1, 2023. *See* Dkt. 1. Plaintiffs now seek the instant preliminary injunction to prevent Defendant Borough of Pottstown from closing the College Drive Encampment in violation of their Eighth and Fourteenth Amendments while this litigation is pending.

### III.    LEGAL STANDARD

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, the moving parties "must establish that (A) they are likely to succeed on the merits of their claims, (B) they are likely to suffer irreparable harm without relief, (C) the balance of harms favors them, and (D) relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citing *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014)).  Here, Plaintiffs satisfy every element, so the preliminary injunction should issue.

### IV.    ARGUMENT

Plaintiffs' motion for a preliminary injunction should be granted because (1) Plaintiffs are likely to succeed on the merits of their claims; (2) without a preliminary injunction, Plaintiffs will suffer irreparable harm to their constitutional rights; (3) the balance of harms favors Plaintiffs because, absent an injunction, Plaintiffs' constitutional rights will be violated whereas the injunction preserves the longstanding status quo that has not caused significant harm to Defendant; and (4) enjoining Defendant serves the public interest by protecting the best interests and constitutional rights of unhoused Borough of Pottstown residents.

### A.    Plaintiffs are Likely to Succeed on the Merits.

First, Plaintiffs are very likely to succeed on the merits in the instant litigation.  To demonstrate a likelihood of success on the merits, "the movant need only prove a 'prima facie case,' not a 'certainty' she'll win."  *Id.* (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001)).  It is not necessary "that the right to a final decision after trial be 'wholly without doubt'; the movant need only show a 'reasonable probability' of success."  *Id.* (quoting *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980)).  Here, there is a strong likelihood

that Defendant's plan to sweep the College Drive Encampment and order all residents of the

encampment to relocate will violate Plaintiffs' constitutional rights.[2]

      1.  *Eighth Amendment – Cruel and Unusual Punishment*

First, Defendant's plan to sweep the College Drive Encampment, particularly under the

threat of criminal sanctions, violates the Eighth Amendment of the United States Constitution.

Under the Eighth Amendment, unhoused residents have a right to be free from Cruel and

Unusual Punishment.  Courts have found that the "Eighth Amendment prohibits the imposition

of criminal penalties for sitting, sleeping, or lying outside on public property for homeless

individuals who cannot obtain shelter."  *Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir.

2019) (finding that a city ordinance criminalizing sleeping in public violated the Eighth

Amendment, where no other sleeping space was practically available to unhoused individuals);

*Johnson v. City of Grants Pass*, 72 F.4th 868, 877 (9th Cir. 2023) ("Pursuant to *Martin*, it is an

Eighth Amendment violation to criminally punish involuntarily homeless persons for sleeping in

public if there are no other public areas or appropriate shelters where those individuals can

sleep.") (internal citation omitted); *Phillips v. City of Cincinnati*, No. 1:18-CV-541, 2020 WL

4698800 (S.D. Ohio Aug. 13, 2020) (finding that unhoused plaintiffs adequately alleged an

Eighth Amendment claim, where the city had a policy and practice of criminalizing

homelessness, destroying unhoused individuals' property, and banning homeless encampments,

and no shelter was available to these individuals); *Pottinger v. City of Miami*, 810 F. Supp. 1551,

1564 (S.D. Fla. 1992) ("[A]rresting the homeless for harmless, involuntary, life-sustaining acts

---

[2] Plaintiff Better Days Ahead has organizational standing to assert these constitutional violations because, as described in Section II(D)(3) above, its mission will be frustrated and it will be forced to divert resources as the result of Defendant Borough of Pottstown's threatened actions.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

such as sleeping, sitting or eating in public is cruel and unusual.").  This is because "a person

may not be prosecuted for conduct that is involuntary,'" including homelessness.  *Johnson*, 72

F.4th at 890; *see also Robinson v. California*, 370 U.S. 660 (1962); *Powell v. Texas*, 392 U.S.

514 (1968); *c.f. Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 284 (4th Cir. 2019).

    To avoid violating the Eighth Amendment, a municipality intending to sweep a homeless

encampment on public property must show that the unhoused residents have "adequate

temporary shelter" that is "practically available" to them.  *Martin*, 920 F.3d at 618 & n.8; *see

also Pottinger*, 810 F. Supp. at 1565; *Fund for Empowerment v. City of Phoenix*, 646 F. Supp. 3d

1117, 1125 (D. Ariz. 2022) ("[T]he City bears the burden of enforcing its ordinances against

only those who can practically obtain shelter."); *Murray v. City of Philadelphia*, 481 F. Supp. 3d

461, 475 (E.D. Pa. 2020) (implying that a city must demonstrate "immediately available housing

for all encampment residents" before closing an encampment); *McArdle v. City of Ocala*, 519 F.

Supp. 3d 1045, 1051 (M.D. Fla. 2021) ("The Court notes that courts examining similar

ordinances consider the availability of homeless shelters when assessing whether the ordinance

constitutes cruel and unusual punishment.").

    Here, Defendant Borough of Pottstown has warned the College Drive Encampment

residents that it will close the College Drive Encampment on December 1, 2023.  Ex. G.

Defendant Borough of Pottstown, via the Pottstown PD, further warned Access Services that it

will be informing College Drive Encampment Residents that they may be arrested for trespass if

they stay at the College Drive Encampment following its closure, and the signs that Defendant

Borough of Pottstown placed near the encampment state "NO TRESPASSING."  Aff. of M.

Boorse at ¶ 13, Ex. B; Ex. G.  Threatening criminal trespass sanctions for remaining at the

College Drive Encampment following its closure plainly runs afoul of the Eighth Amendment's

prohibition on criminalization of involuntary acts, such as engaging in unavoidable human activity like sleeping while homeless.

Moreover, Defendant Borough of Pottstown is not offering any meaningful alternative shelter to the College Drive Encampment residents.  As discussed in detail in Section II(C) above, Defendant Borough of Pottstown's sign regarding the College Drive Encampment closure merely directs College Drive Encampment residents to dial Montgomery County's call center for unhoused residents or to attempt to access the Beacon of Hope church-based warming center in Pottstown.  Ex. G.  Neither option, however, has adequate shelter to offer.

Specifically, as explained in Section II(A) and (C) above, Montgomery County's call center does not have the capacity to offer immediate emergency shelter because Montgomery County has a lengthy waitlist for hotel beds.  At this time, unhoused residents must wait three to six months for a hotel bed, depending on the resident's particular vulnerability factors.  Aff. of M. Boorse at ¶ 11, Ex. B.

Likewise, Beacon of Hope cannot meet College Drive Encampment residents' need for alternative shelter.  As an initial matter, Beacon of Hope's warming center does not provide reliable, continuous shelter housing.  Instead, Beacon of Hope's warming center provides beds on a first-come, first-served basis each night.  Aff. of T. Niarhos at ¶ 5, Ex. C.  Unhoused residents cannot remain at the warming center for more than approximately fourteen (14) hours each day, and receiving a bed one night does not guarantee a bed the next night.  *Id.* at ¶¶ 5-6.  As beds are not guaranteed for more than one night at a time, requiring College Drive Encampment residents to leave the encampment permanently and to rely solely on Beacon of Hope's warming center would place residents in the incredibly precarious position of needing to secure shelter in the middle of winter on a night-by-night basis, without any backup option

should Beacon of Hope turn them away.  The extreme short-term, tenuous nature of Beacon of Hope's warming center program renders it inadequate as alternative shelter.

Moreover, in any event, Beacon of Hope expects to be beyond its capacity and already turning away unhoused residents by December 2023.  Aff. of T. Niarhos at ¶¶ 8, 12, 17, 22-23, Ex. C.  Indeed, due to Beacon of Hope's limited capacity, compounded by Defendant Borough of Pottstown's actions that will further reduce its capacity for January 2024, Beacon of Hope informed Defendant Borough of Pottstown that it would not be able to assure overnight warming beds for displaced College Drive Encampment residents, but Defendant Borough of Pottstown *chose to go ahead and list Beacon of Hope as a source of alternative shelter anyway without the organization's consent*.  *Id.* at ¶¶ 15-17, 21-22; Ex. G.

In fact, apparently recognizing that Defendant Borough of Pottstown has no genuine plans to offer alternative shelter, Officer Guth directly encouraged Unhoused Plaintiff Mr. Beltran and another College Drive Encampment resident to relocate to private property or other outdoor spaces owned by entities other than Defendant Borough of Pottstown.  Aff. of M. Boorse at ¶ 16, Ex. B; Aff. of A. Beltran at ¶ 19, Ex. D.  Accordingly, there is no doubt that Defendant Borough of Pottstown has no plans to provide "adequate temporary shelter" that is "practically available" to Unhoused Plaintiffs and to other College Drive Encampment residents following Defendant Borough of Pottstown's closure of the encampment.

Forcing Unhoused Plaintiffs to relocate to other outdoor spaces, as Officer Guth explicitly recommended, will constitute cruel and unusual punishment because it will strip Unhoused Plaintiffs and other College Drive Encampment residents of the security, mutual protection, support, and access to social services that they gain by being together in the encampment, threatening their health and safety and placing them at greater risk of crime.  Aff.

of A. Beltran at ¶¶ 6, 11, Ex. D; Aff. of D. Wanner at ¶¶ 6, 11, Ex. F; Aff. of M. Boorse at ¶ 23, Ex. B (noting that closing encampments may disrupt continuity of medical care through the Street Medicine program and force encampment residents into less safe spaces).  Should Defendant Borough of Pottstown also dispose of College Drive Encampment residents' property, such as tents, clothing, bedding, and identification cards, after December 1, 2023, Unhoused Plaintiffs and other residents will also be exposed to the elements as the weather turns colder, likely placing College Drive Encampment residents in immediate danger.  Aff. of A. Beltran at ¶¶ 12, 14, Ex. D; Aff. of D. Wanner at ¶¶ 12, 14, Ex. F.  Placing Unhoused Plaintiffs and other College Drive Encampment residents at such risk simply due to their need to shelter themselves undoubtedly violates the Eighth Amendment.

## 2.  *Fourteenth Amendment – State-Created Danger Doctrine*

Next, closing the College Drive Encampment and ordering Unhoused Plaintiffs and other College Drive Encampment residents to relocate violates the State-Created Danger Doctrine under the Fourteenth Amendment.  People have a constitutionally protected liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).  Thus, when the government creates a foreseeable danger to a person in willful disregard of that person's safety, the government is liable for the harm under the "state-created danger" doctrine.  *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (A "constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'") (quoting *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003)).

As described in Section II(D) above, Defendant Borough of Pottstown's planned closure of the College Drive Encampment on December 1, 2023 risks posing substantial harm to Unhoused Plaintiffs and other College Drive Encampment residents.  Most importantly, sweeping the College Drive Encampment and ordering residents to relocate strips unhoused residents of the safety and security they achieve by banding together at the College Drive Encampment, increasing the likelihood of residents experiencing violence and crime.  It also obstructs Plaintiff Better Days Ahead's and Access Services's ability to provide College Drive Encampment residents with food, other life-sustaining supplies, and medical visits by dispersing residents and forcing agencies to find where each unhoused resident relocated.  Aff. of M. Boorse at ¶¶ 6, 23, Ex. B; Aff. of C. Brickhouse at ¶¶ 5, 11, Ex. H.  This not only frustrates Plaintiff Better Days Ahead's mission, but also reduces unhoused residents' access to food, continuity of medical care, and other life-sustaining supplies.

Moreover, Defendant Borough of Pottstown's signs indicate that Defendant Borough of Pottstown will unilaterally deem any property remaining at the encampment after December 1, 2023 to be abandoned and will proceed to dispose of it.  Ex. G.  As explained above, if Defendant Borough of Pottstown goes through with this plan and disposes of the property that unhoused residents rely on for shelter and survival, unhoused residents will be more exposed to the elements right as the weather becomes colder, placing residents in immediate danger.  Aff. of A. Beltran at ¶¶ 12, 14, Ex. D; Aff. of D. Wanner at ¶¶ 12, 14, Ex. F.  The likelihood of such harm demonstrates that Defendant Borough of Pottstown's actions will violate the State-Created Danger Doctrine.  *See, e.g.*, *Phillips*, 2020 WL 4698800 at *648–49 (finding homeless plaintiffs stated plausible state-created danger claim where city had threatened to and taken some actions to destroy plaintiffs' property and to force plaintiffs to move to more dangerous areas).

18

### B.     Irreparable Harm

Plaintiffs will suffer irreparable harm if this Court does not issue a preliminary injunction.  To demonstrate "irreparable harm[,] a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)).  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007) (quoting 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed.1995)); *see also Santa Cruz Homeless Union v. Bernal*, 514 F. Supp. 3d 1136, 1145 (N.D. Cal. 2021), modified, No. 20-CV-09425-SVK, 2021 WL 1256888 (N.D. Cal. Apr. 1, 2021) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm.") (quoting *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991)) (internal quotation marks omitted).

As discussed in Section IV(A) above, Defendant Borough of Pottstown will violate Plaintiffs' rights under the Eighth and Fourteenth Amendments unless this Court intervenes. These constitutional violations alone establish irreparable harm sufficient for this Court to enter a preliminary injunction.

But on top of the violations of Plaintiffs' constitutional rights, as described above, Defendant intends to close the College Drive Encampment and to demand, under the threat of arrest for trespass, that unhoused residents relocate with no other safe space to go.  Ordering unhoused residents to relocate strips them of the safety and security, protection from crime, social connections, sense of community, and access to social services that they gain by banding

together in encampments.  Aff. of A. Beltran at ¶¶ 6, 11, Ex. D; Aff. of D. Wanner at ¶¶ 6, 11,

Ex. F.  Without the safety and support of the encampments, unhoused residents are likely to be at

greater risk of crime, and may face emotional harm from the loss of social relationships.  Aff. of

A. Beltran at ¶¶ 6, 11, Ex. D; Aff. of D. Wanner at ¶¶ 6, 11, Ex. F.  The threat of arrest for

trespass also risks subjecting Unhoused Plaintiffs and other College Drive Encampment residents

to confinement and criminal penalties.

     Moreover, at the same time that Defendant orders unhoused residents to relocate, it also

appears likely that Defendant will, in some circumstances, separate residents from and eventually

destroy the property that they rely upon to survive, including items such as tents, bedding

materials, and clothing.  Without these items, Unhoused Plaintiffs will be exposed to the

elements and in immediate danger right as the weather turns colder.

     It is thus plain that Defendant's planned actions will make Unhoused Plaintiffs and other

College Drive Encampment residents far more vulnerable, and will likely place many College

Drive Encampment residents at risk of serious immediate danger.  Such injuries undoubtedly

constitute irreparable harm sufficient for this Court to enter a preliminary injunction.  *See, e.g.*,

*Santa Cruz Homeless Union*, 514 F. Supp. 3d at 1145 ("Plaintiffs have shown the likelihood of

being placed in a position of danger in violation of their substantive due process rights" based on

the planned closure of their homeless encampment); *Coal. On Homelessness v. City & Cnty. Of*

*San Francisco*, No. 22-CV-05502-DMR, 2022 WL 17905114, at *25 (N.D. Cal. Dec. 23, 2022)

("Plaintiffs have submitted evidence that encampment closures . . . harm homeless individuals in

[sic] myriad ways, including negatively impacting their physical and mental health."); *Fund for*

*Empowerment v. City of Phoenix*, No. CV-22-02041-PHX-GMS, 2022 WL 18213522, at *7 (D.

Ariz. Dec. 16, 2022); *Cobine v. City of Eureka*, No. C 16-02239 JSW, 2016 WL 1730084, at *7 (N.D. Cal. May 2, 2016).

      **C.**     **Balancing of Harms**

      The balance of harms weighs in favor of Plaintiffs.  In balancing the harms to the parties, the court must weigh the potential injury to Plaintiffs without an injunction versus the potential injury to Defendant with an injunction in place.  *See Issa*, 847 F.3d at 143.  The balance can be tipped by likelihood of success because "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co*., 290 F.3d 578, 597 (3d Cir. 2002) (quoting *NLRB v. Electro–Voice, Inc.,* 83 F.3d 1559, 1568 (7th Cir. 1996)).  Here, Plaintiffs are likely to prevail, so the balance weighs in favor of Plaintiffs.

      In addition, as described in Section IV(B) above, Unhoused Plaintiffs will be at grave risk of severe physical and emotional harm unless this Court enters an injunction.  These harms include, but are not limited to, increased risk of crime, loss and damage to personal property, emotional harm from the loss of social relationships and personal property, and the risk of exposure to the elements.  In addition, dispersing Unhoused Plaintiffs and other College Drive Encampment residents will likely disrupt the continuity of residents' medical care through the Street Medicine Program and impede the delivery of the life-sustaining food and supplies that Plaintiff Better Days Ahead provides to unhoused residents by making it more difficult for Access Services/Street Medicine, Plaintiff Better Days Ahead, and other social service agencies to find and serve the residents that depend on them.

      Defendant Borough of Pottstown, by contrast, will suffer limited, if any, harm through the issuance of this injunction because the injunction not only preserves the longstanding status

quo, but also leaves Defendant with a clear way out—it can genuinely offer Unhoused Plaintiffs alternative housing.  If Defendant Borough of Pottstown genuinely offers Unhoused Plaintiffs and the College Drive Encampment residents alternative housing, then it can close the College Drive Encampment.  *See, e.g.*, *Fund for Empowerment*, 646 F. Supp. 3d at 1131 (holding that the balance of equities favored unhoused individuals and non-profits where the municipal defendant could continue to enforce its ordinance when shelter housing is available to unhoused individuals).  Accordingly, as the injunction offers Defendant Borough of Pottstown the ability to mitigate any harm to itself by providing alternative housing to the College Drive Encampment residents, the balance of harms weighs in favor of Plaintiffs.

### D.     Impact on the Public Interest

Finally, the public interest weighs in favor of granting Plaintiffs' request for a preliminary injunction.  "If a plaintiff proves 'both' a likelihood of success on the merits and irreparable injury, it 'almost always will be the case' that the public interest favors preliminary relief."  *Issa*, 847 F.3d at 143 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).  Moreover, the public interest generally weighs in favor of protecting basic rights.  *See, e.g.*, *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997); *Buck*, 485 F. Supp. 2d at 587; *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 781 (M.D. Pa. 2016).  Here, Plaintiffs have demonstrated a high likelihood of success on the merits and irreparable injury, as described above.  Moreover, they are seeking an injunction to protect their basic constitutional rights, and, as described above, Defendant Borough of Pottstown can mitigate any counterbalancing interests by simply providing the College Drive Encampment residents with housing.  Thus, the public interest clearly supports granting

Plaintiffs' motion.[3]

## V.     CONCLUSION

To prevent further irreparable harm, Plaintiffs respectfully request an order from this

Court enjoining Defendant from closing the College Drive Encampment and/or ordering

unhoused residents located at the College Drive Encampment to relocate, unless it first genuinely

offers them alternative housing.

Respectfully submitted,                              Date. Nov. 2, 2023

_/s/ Marielle Macher_                                _/s/ Carolyn E. Johnson_
Marielle Macher, Esq.                                Carolyn E. Johnson, Esq.
Pa. Bar No. 318142                                   Pa. Bar. No. 49188
Daniel Vitek, Esq.                                   Charles Burrows, Esq.
Pa. Bar No. 209013                                   Pa. Bar No. 331591
Community Justice Project                            Lisa Whalen, Esq.
118 Locust Street                                    Pa. Bar No. 323530
Harrisburg, PA 17101                                 Legal Aid of Southeastern PA
mmacher@cjplaw.org                                   151 West Marshall Street, Building 1
dvitek@cjplaw.org                                    Norristown, PA 19041
717-236-9486 x 214                                   cjohnson@lasp.org
                                                     cburrows@lasp.org
                                                     lwhalen@lasp.org
                                                     877-429-5994

---

[3] This Court should grant this preliminary injunction request without requiring Plaintiffs
to post bond under Federal Rule of Civil Procedure 65(c), or, in the alternative, should require
only a _de minimis_ bond, because granting this preliminary injunction does not pose a risk of
monetary loss to Defendant Borough of Pottstown, the balance of harms weighs in favor of
Plaintiffs, and Plaintiffs are indigent unhoused individuals and a non-profit serving unhoused
individuals who will be unable to pay more than a very small bond.  _See Marshall v. Amuso_, 571
F. Supp. 3d 412, 430 (E.D. Pa. 2021) (bond may be waived when the preliminary injunction does
not risk monetary loss to the defendant and when the equities weigh in favor of the plaintiff);
_Temple Univ. v. White_, 941 F.2d 201, 220 (3d Cir. 1991) (bond may be waived to enable
plaintiffs who may be unable to pay the bond to enforce rights in the public interest); _Gilliam v.
United States Dep't of Agric._, 486 F. Supp. 3d 856, 882 (E.D. Pa. 2020) (waiving bond
requirement for indigent plaintiffs).

## <u>CERTIFICATE OF SERVICE</u>

I, Marielle Macher, Esq. hereby certify that a true and correct copy of the foregoing

Plaintiffs' Brief in Support of Plaintiffs' Motion for a Preliminary Injunction was e-mailed to

counsel for Defendant Borough of Pottstown at the following contact information:

Charles D. Garner, Jr., Esq.
Wolf, Baldwin & Associates, P.C.
800 E. High St.
Pottstown, PA 19464-0444
cgarner@wolfbaldwin.com

Date: Nov. 2, 2023                      /s/ *Marielle Macher*_____
                                        Marielle Macher, Esq.
                                        PA Bar No. 318142
                                        Community Justice Project
                                        118 Locust Street
                                        Harrisburg, PA  17101
                                        (717) 236-9486
                                        mmacher@cjplaw.org

                                        *Plaintiffs' Counsel*