# EXHIBIT "A"







# EXHIBIT "B"

2022 WL 282912
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Cheri HONKALA et al.
v.
U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, et al.

CIVIL ACTION NO. 21-0684
|
Filed 01/31/2022

**Attorneys and Law Firms**

J. Conor Corcoran, Law Office of J. Conor Corcoran,
P.C., Philadelphia, PA, for Cheri Honkala, Poor People's
Economic Human Rights Campaign, Yesenia Cruz,
Minor, Aaliyah Crouch, Zion Chick.

Jennifer Bennetch, Philadelphia, PA, Pro Se.

Elizabeth L. Coyne, U.S. Attorney's Office, Philadelphia,
PA, for U.S. Department of Housing & Urban
Development, Marcia Fudge, Department of Health And
Human Services 200 Independence Avenue S.W.
Washington, DC 20201, Xavier Becerra.

John P. Gonzales, John L. Lamb, Katherine Ann Cordry,
Marshall Dennehey Warner Coleman and Goggin, P.C.,
Philadelphia, PA, for Philadelphia Housing Authority.

Megan Linsley Davis, Admin Office of PA Courts,
Philadelphia, PA, for First Judicial District of
Pennsylvania.

Danielle B. Rosenthal, James B. Pancio, City of
Philadelphia Law Department, John P. Gonzales,
Marshall Dennehey Warner Coleman and Goggin, P.C.,
Philadelphia, PA, for City of Philadelphia.

## MEMORANDUM

Gerald Austin McHugh, United States District Judge

**\*1** This case starkly illustrates the limitations of civil
litigation as a means to address critical social ills.
Plaintiffs include several persons suffering from
homelessness who occupied a vacant property owned by
the Philadelphia Housing Authority. They did so on the
advice of a community activist, Cheri Honkala and the
Poor People's Economic Human Rights Campaign, as
part of a series of "takeovers" of properties they believed
should be used for low-income housing. The Philadelphia
Housing Authority posted a notice of eviction at the
property, which prompted Plaintiffs' lawsuit against it and
other federal and local authorities. Those entities now
move to dismiss, contending that Plaintiffs fail to state
legally cognizable claims.

As a means of focusing attention on governmental failure
to make effective use of assets available to reduce
homelessness, this action succeeds. And if principles of
natural law provided the controlling standard, Plaintiffs
would have a compelling moral argument: "In cases of
need, all things are common property, so there would
seem to be no sin in taking another's property, for need
has made it common." Thomas Aquinas, *Summa
Theologica* 2.2, Question 66, Article 7. But civil law is
not designed to answer such ultimate moral questions. It
focuses instead on specific rights and remedies conferred
by statute or common law. When analyzed within that far
more limited framework, the novel theories of recovery
advanced by Plaintiffs are unsupportable. I am therefore
compelled to dismiss the case.

### I. Relevant Factual and Procedural Background

This case arises out of a homelessness crisis that is
rampant and escalating in Philadelphia and across the
United States. In the United States, chronic homelessness
increased by 15% between 2019 and 2020.[1] The 2019
Philadelphia Office of Homeless Services' Point-In-Time
(PIT) count describes the number of chronically homeless
people in Philadelphia as having "increased
dramatically."[2] In 2018, the total number of people
experiencing homelessness in Philadelphia was 5,788.[3] Of
those 5,788 individuals, 4,364 individuals were Black
Philadelphians. *Id.* Between 2019 and 2020, people
identifying as African American accounted for 39 percent
of people experiencing homelessness generally and 53
percent of people experiencing homelessness in family
units, despite representing only 13 percent of the total
U.S. population.[4]

**\*2** Although the full effect of the COVID-19 pandemic

cannot yet be measured and is still ongoing, according to the National Low Income Housing Coalition, (NLHC), a respected non-profit organization, job losses from the pandemic have exacerbated housing insecurity among low-income renters and contributed to the homelessness crisis.⁵ Not surprisingly, those without basic shelter may be at an increased risk of severe illness from COVID-19.⁶

As noted by Plaintiffs, while the COVID-19 pandemic was spreading, hundreds of activists and people experiencing homelessness occupied encampments at various sites in Philadelphia, calling for permanent and fair housing. SAC ¶¶21-29. Those encampments became the subject of litigation in the Eastern District of Pennsylvania in *Murray et. al v. City of Philadelphia, et al.,* 481 F. Supp. 3d 461 (E.D. Pa. 2020), in which plaintiffs experiencing homelessness sought to bar the Defendant City of Philadelphia from disbanding the encampments. Judge Eduardo Robreno issued a decision denying motions for a temporary restraining order and preliminary injunction, but in doing so underscored the seriousness of the problem. "The task of finding if not a solution at least some relief to this [homelessness] crisis rests squarely on the shoulders of the City's elected officials. It is an enormous challenge. But further indecision and neglect will only make it worse." *Id.* at 466; SAC ¶26.

In the midst of this housing and public health crisis, adult Plaintiff Yesenia Cruz, her three minor children, E.R, E.C. and I.R, alongside adult Plaintiffs Zion Chick and Aaliyah Crouch were unhoused. Plaintiffs had been without regular and secure housing for the prior eight years, because of – among other reasons – periodic unemployment and "endemic stagnancy" on Philadelphia's waiting list for public housing, which has been closed since 2013.⁷ SAC ¶48. Plaintiffs plead that they were unable to reside in shelters because of age and location requirements which would have required Plaintiff Yesenia Cruz to be separated from her minor children, including her three-year old grandson. SAC ¶49. All Plaintiffs are Latino or African American. SAC ¶¶3-5.

In their search for housing, Plaintiffs sought help from Cheri Honkala, a community activist, and the nonprofit she operates, Poor People's Economic Human Rights Campaign ("PPEHRC"). *Id.* ¶51. The organization's stated mission is to "improve the public health, housing conditions and economic rights of poor people in Philadelphia." *Id.* ¶¶1-2.

In August 2020, Cheri Honkala and PPEHRC "procured" 2736 N. Howard Street, Philadelphia, PA 19133 for Plaintiffs to live in. *Id.* ¶46. The property is legally owned by the Philadelphia Housing Authority ("PHA") and is held in trust for the benefit of the U.S. Department of Housing and Urban Development (HUD), pursuant to a Declaration of Trust recorded in Philadelphia.⁸ *Id.* ¶¶3-8,44-46; *see* PHA and HUD Declaration of Trust, recorded on or around August 30, 2012, Defendant PHA's Motion to Dismiss, Ex. 1, ECF 33. But at the time, the property was vacant, and pursuant to Ms. Honkala's advice, Plaintiffs occupied the property without permission from PHA or HUD. SAC ¶43. Ms. Honkala describes the property as a "takeover house[ ]" and admits that 2376 N. Howard Street was not the only property that she procured for individuals experiencing homelessness. She helped such individuals move into "takeover houses," *id.* ¶58 n. 22, which Plaintiffs assert had been "abandoned and neglected by the federal government"⁹ and were "suitable for the purposes of providing shelter to ... individuals and families, during the clear and present public health and housing crises presented by the Covid-19 pandemic." *Id.* ¶43. Plaintiffs Honkala and PPEHRC allege that they "provided the resources and/or labor to rehabilitate" 2376 N. Howard Street and other properties so that they would be "fit for human habitation." *Id.* ¶46.

**\*3** On February 8, 2021, Defendant PHA posted "Notice to Vacate" on 2736 N. Howard Street, ordering Plaintiffs to vacate the property. *Id.* ¶53. According to the Notice to Vacate, the property was "marked for rehabilitation because it is not safe for occupancy," and Plaintiffs were informed that a maintenance crew would return in 72 hours to evict the individuals. SAC, Ex. A. Plaintiffs have not alleged that they either left the property or were forced to leave it because of this eviction notice. But they allege that the posting of the notice has caused them to suffer from anxiety, depression, mental health ailments, and/or disabilities or disorders for which they lack care. *Id.* ¶59.

In addition to facing the threat of eviction, Plaintiffs allege that beneficiaries of Cheri Honkala and PPEHRC's work "such as Plaintiff(s) and the minor Plaintiff(s) herein, have been threatened by Defendant(s) with (or actually have been) subjected to the forced separation of their families" when the Philadelphia Police Department, the Philadelphia Department of Human Services, the Sheriff's Office of Philadelphia, and/or the First Judicial District of Philadelphia placed minors in foster care. *Id.* ¶57. It is unclear as pleaded whether plaintiffs themselves were threatened or subjected to the forced separation of their families, or whether the allegations refer generally to beneficiaries of Ms. Honkala and PPEHRC's work. Plaintiffs do not specify when they were purportedly threatened by Defendant(s) nor do they specifically allege

that the Plaintiff minor children were in fact ever separated from their caregivers.

Ms. Honkala originally filed this lawsuit *pro se* and on behalf of PPEHRC and the individual Plaintiffs on February 2, 2021. ECF 1. After obtaining counsel, Plaintiffs filed an Amended Complaint on June 29, 2021, ECF 13, and a Second Amended Complaint on September 27, 2021. ECF 31. The Second Amended Complaint alleges various causes of action against the City of Philadelphia, the Philadelphia Housing Authority (PHA), the First Judicial District of Pennsylvania (FJD), and federal defendants including U.S. Department of Housing and Urban Development (HUD); Marica Fudge, Secretary of HUD; U.S. Department of Health and Human Services ("HHS"); and Xavier Becerra, Secretary of HHS. Plaintiffs seek declaratory relief establishing that the individual Plaintiffs may remain lawfully 2736 N. Howard Street, an injunction permanently enjoining Defendants from evicting Plaintiffs from the property, a declaration that all unutilized and underutilized federal public buildings and real property be used for purposes of ameliorating the homelessness crisis in Philadelphia, and an award of compensatory and punitive damages to fund a Conservator to rehabilitate the Property.

## II. Standard of Review
Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).[10]

## III. Discussion
The Complaint is scattershot, often lacking in precision, and alleges liability based on several unrelated statutes and purported violations of constitutional rights. Defendants City of Philadelphia, First Judicial District of Pennsylvania, Philadelphia Housing Authority, Marcia Fudge, U.S. Department of Housing & Urban Development, Department of Health and Human Services, and Xavier Becerra move to dismiss Plaintiffs' claims. Plaintiffs allege violations of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. (hereinafter the "FHA"), the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb et seq. (hereinafter "RFRA"), the Religious Land Use and Institutionalized Persons Act of 2000 (hereinafter "Religious Land Use Act"), 42 U.S.C. §§ 2000cc et seq., 42 U.S.C. § 1983 (hereinafter "Section 1983"), the

Stewart B. McKinney Homelessness Assistance Act (hereinafter the "McKinney Act"), 42 U.S.C. §§ 11411, et seq., and Plaintiffs' rights under the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.[11] Plaintiffs also seek declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq. *Id.*[12] For the below reasons, Defendants' motions to dismiss are granted and Plaintiffs' Second Amended Complaint is dismissed in full.

### 1. Plaintiffs Fail to State a Claim Against the First Judicial District
**\*4** As an initial matter, the conduct complained of in support of this claim—posting an eviction notice on 2736 N. Howard Street in the midst of a public health and housing crisis—stems from actions taken by Defendant PHA. SAC ¶53. Nonetheless, Plaintiffs assert claims against the First Judicial District (FJD) but fail to specify what role, if any, the FJD played in these events. Plaintiffs generally allege that the FJD is "empowered by the Pennsylvania Constitution and/or legislature to conduct and preside over landlord/tenant and/or residential real estate litigation matters," *id.* ¶ 9, but do not even allege that the FJD has, in fact, presided over any cases involving these Plaintiffs. They further state that all Defendants acted in furtherance of a conspiracy but include no factual allegations that would support a finding of conspiracy. *See supra*, note 12. Plaintiffs Cheri Honkala and PPEHRC further allege that the beneficiaries of their efforts "have been threatened by Defendant(s) with (or actually have been) subjected to the forced separation of their families by the violent seizure and relocation of said minors to foster housing by the Philadelphia Police Department, the Philadelphia Department of Human Services, the Sheriff's Office of Philadelphia and/or the First Judicial District of Pennsylvania," *id.* ¶57, without in any way specifically linking the First Judicial District of Pennsylvania to the conduct alleged.

As the First Judicial District correctly points out "[t]he FJD, acting through its judges, is a neutral arbiter of the disputes that come before it. It has no interest in the enforcement of any laws or ordinances that may be levied against Plaintiffs either now or in the future."[13] Def. FJD's Mot. to Dismiss at 11-12, ECF 39. As a rule, judges are not appropriate parties for suit simply on the basis that they applied statutory law through recognized judicial procedures. *See Allen v. Debello*, 861 F.3d 433, 440 (3d Cir. 2017) (citing *In re Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17, 21 (1st Cir. 1982)) (noting that

"judges sit as arbiters without a personal or institutional stake on either side of the constitutional controversy" and they "have played no role in a statute's enactment, they have not initiated its enforcement, and they do not even have an institutional interest in following their prior decisions (if any) concerning its constitutionality if an authoritative contrary legal determination has subsequently been made.").

The Plaintiffs have failed to plead that the FJD, in its role as a neutral arbiter, engaged in any form of discriminatory housing practices (Count I), placed any burden on the exercise of Plaintiffs' alleged religious beliefs (Count II), failed in any alleged obligation to provide secure housing (Count III, IV, and V), or otherwise violated Plaintiffs' constitutional rights. Without providing more than "legal conclusion[s] couched as [ ] factual allegations" that the FJD violated Plaintiffs' rights, Plaintiffs' claims against FJD fail to state a plausible claim for relief and are dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. Plaintiffs Fail to Establish a Claim Under the Fair Housing Act

The Fair Housing Act makes it illegal to discriminate in the sale or rental of housing, because of race, color, national origin, religion, sex, familial status, or national origin. 42 U.S.C. § 3604(b). Under the Fair Housing Act, it is unlawful to "make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter ... or (C) any person associated with that buyer or renter." 42 U.S.C.A. § 3604(f)(1) (West Supp. 1992).

To bring a discrimination claim under the FHA, a plaintiff must demonstrate that he or she is a "buyer or renter" within the meaning of the FHA. A claimant is said to be a "buyer or renter" when he or she supplies consideration in exchange for an interest in property. *See* 42 U.S.C. § 3602 (defining "to rent" for purposes of the FHA as "to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant"); *Growth Horizons, Inc. v. Delaware Cty.*, 983 F.2d 1277, 1283 n.10 (3d Cir. 1993) ("Because the handicapped individuals in this case are not supplying the funds nor seeking a proprietary interest in the property, they are neither buyers nor renters"); *Warthuft v. Milton Hersey Sch. and Sch. Trust*, 400 F.Supp.3d 91, 104–105 (M.D. Pa. 2019) ("A claimant is said to be a 'buyer or renter' under the FHA when he or she supplies consideration in exchange for an interest in property.").

*5 Plaintiffs claim to be renters of the property and argue that Defendants' "actions and/or inactions ... constitute discrimination ... in the terms, conditions or privileges of the rental property at issue, and/or the provision of services or facilities in connection therewith, because of Plaintiff(s)' race, color religion, and or familial status" and "handicap." SAC ¶¶75, 79.

As a threshold matter, Plaintiffs' claims against federal Defendants fail because the Plaintiffs have not alleged that federal Defendants sought to or seek to remove Plaintiffs from 2376 N. Howard Street. Plaintiffs plead only that PHA, not the federal Defendants, posted the eviction notice. And although the property at issue is held in trust for the federal government, Plaintiffs have nonetheless failed to plead that federal Defendants had any role in the decision to post the eviction notice. Even if Plaintiffs can demonstrate that the federal government has contributed to the housing crisis, the harm as alleged is not concrete and particularized enough to sustain a claim.

Moreover, as to all Defendants, Plaintiffs' claims under the Fair Housing Act fail because Plaintiffs are not renters of the property at issue, as they themselves admit. *Id.* ¶¶44-46. Indeed, Plaintiffs acknowledge that the property at issue is "public housing," not housing that they own or rent. *Id.* at ¶45; *see also* Def. Ex. 1. And although the property was purportedly abandoned, "no authority exists in Pennsylvania that allows for the abandonment of real property" when, as here, it is "owned in fee simple with perfect title." *See e.g.*, *Pocono Springs Civic. Assoc., Inc. v. MacKenzie*, 667 A.2d 233, 236 (Pa. 1995).

Plaintiffs respond by arguing that their work to rehabilitate the "abandoned" property constitutes the consideration necessary to make them renters. Pls. Answer to Def. PHA's Mot. to Dismiss at 4-5. But under basic principles of contract law, there must be a "mutual meeting of the minds" between Plaintiffs and the owner of the property, the PHA, that Plaintiffs would rehabilitate the building, and in exchange, be able to live in it rent-free. *See Richter v. Pfundt*, No. 09-2604, 2009 WL 5064383 (E.D. Pa. Dec. 24, 2009) (citing *Yarnall v. Almy*, 703 A.2d 535, 538 (Pa. Super. Ct. 1997)). Plaintiffs' argument fails as their unilateral decision to rehabilitate a property does not give rise to an enforceable contract.

### 3. Plaintiffs Fail to Establish a Claim under the Religious Freedom Restoration Act or the Religious Land Use and Institutionalized Persons Act

Honkala v. U.S. Department of Housing and Urban Development, Slip Copy (2022)

*a. Plaintiffs' RFRA Claims*

Plaintiff Cheri Honkala and PPEHRC bring a claim under The Religious Freedom Restoration Act (RFRA) based on the assertion they are "currently possessed of ethical, moral, humanitarian and/or religious belief(s) and action(s), including but not limited to those rooted in a Judeo-Christian tradition of caring for the least and most needy amongst us, which federal law therefore respects and identifies as a 'religious belief' pursuant to the definition thereof as set forth in 42 U.S.C. § 2000cc-5." *SAC* ¶90. Plaintiffs allege that their work "building and/or repairing and/or converting real property, such as the public housing property at issue ... is therefore considered a 'religious exercise,' and Defendants are unable to satisfy their "burden of proving that eviction is the least restrictive means of fostering any compelling interest it may otherwise invoke." *Id.* at ¶¶91, 92, 97.

**\*6** RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000(bb-1)(a), (b). It is, however, well established that RFRA does not apply to states or state agencies, following *City of Boerne v. Flores*, 521 U.S. 507 (1997), in which the Supreme Court held that the Act was unconstitutional as applied to states under Section 5 of the Fourteenth Amendment. *See, e.g., Francis v. Mineta*, 505 F.3d 266, 269 n. 3 (3d Cir. 2007) ("The RFRA applies only to the federal government."); *see also Farm-To-Consumer Legal Def. Fund v. Vilsack*, 636 F. Supp. 2d 116 (D.D.C. 2009) (citing *Olsen v. Mukasey*, 541 F.3d 827, 830 (8th Cir. 2008) (RFRA does not apply to state actors implementing state law)).

Therefore, Plaintiffs' RFRA claims against state agencies and state actors – the PHA and the City of Philadelphia – fail as a matter of law.[15] The Philadelphia Housing Authority is a Commonwealth of Pennsylvania agency, and thus considered to be a state actor. *See City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 118-19 (3d Cir. 1993) (finding that PHA is a Commonwealth agency); *Miley v. Philadelphia Housing Authority*, No. 16-4309, 2016 WL 7175605, at \*2 (E.D. Pa. Dec. 8, 2016) (classifying PHA as a state actor). And the City of Philadelphia, a municipal subdivision created by state law, is also a state actor for these purposes. Plaintiffs also invoke the First Amendment of the United States Constitution, SAC ¶103, but have not set forth any cogent legal argument as to how the City's assertion of its legal right as a property owner to stop trespassing—a

general right neutrally applied—can reasonably be viewed as limiting Plaintiffs' free exercise of religious beliefs. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1871 (2021) (declining to overrule *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) (superseded by statute) with respect to the holding that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.")

Plaintiffs' claims against the federal Defendants fail because, as discussed above, Plaintiffs did not allege that the federal Defendants caused their injuries.

*b. Plaintiff's Religious Land Use and Institutionalized Persons Act Claim*

Next, plaintiffs bring claims under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et. seq, which reads:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on the person, assembly or institution—(A) is in furtherance of a compelling interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc(a)(1)(A), (B). A Land Use regulation is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land ... if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5). Neither Ms. Honkala nor her organization can assert a property interest in the house, nor does this case involve a "zoning or landmarking law" issue.

#### 4. Plaintiffs Fail to Establish a Claim under the McKinney Vento Act

Plaintiffs also bring claims under The McKinney-Vento Act, 42 U.S.C. § 11411. In passing the McKinney Act, "Congress recognized that the federal government 'has a clear responsibility and an existing capacity' to help meet an immediate and unprecedented crisis due to the lack of shelter for a growing number of individuals and families." *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F.Supp.2d 25, 27 (D.D.C. 2000) (quoting 42 U.S.C. § 11301(a)). Specifically, "the McKinney Act operates in conjunction with the Federal Property and Administrative Services Act of 1949 ("Property Act"), 40 U.S.C. § 471 et seq., which requires federal landholding agencies to conduct surveys to determine whether property is excess, surplus, unutilized or underutilized." *Id.* at 27. When an agency of the federal government determines that a property is not required for its needs and is thereby "surplus," the General Services Administration (GSA) must give HUD "priority consideration to potential uses to assist the homeless." *Id.* (citing 42 U.S.C. § 11411(f)(3)(A)). HUD is required to publish a list of available properties that have been determined suitable as a facility to assist the homeless, 42 U.S.C. § 11411(c), *New Life Evangelistic Center, Inc. v. Sebelius*, No. 09–1294, 672 F.Supp 2d 61, *65 (D.C. 2009), and a "representative of the homeless may submit an application" to use such land for that purpose. 42 U.S.C. § 11411(e)(i).

The gist of Plaintiffs' argument seems to be that Defendants have failed to "make ... unutilized or underutilized federal properties available for application by any 'representative of the homeless' " despite the presence of "hundreds and/or thousands of abandoned residential housing shells and plots in Philadelphia, owned by HUD itself" that could house communities experiencing homelessness during a public health and housing crisis of unprecedented scale. SAC ¶¶67-73.

It is unclear whether a private cause of action exists as to this provision of the Act.[16] Even if one did exist, Plaintiffs have not alleged facts that would support a claim under the Act. Plaintiffs somewhat presumptuously allege that "Defendants are more than aware of both Plaintiffs Cheri Honkala and PPEHRC's services and *raison d'etre* in the service of assisting the homeless in the City of Philadelphia," SAC ¶68. I interpret this as Plaintiffs' attempt to allege that they should be acknowledged as representatives of the homeless capable of rehabilitating surplus property for families experiencing homelessness. But nowhere do Plaintiffs allege that they applied to HUD to use property to assist "the homeless," as required under the Act. *See* 42 U.S.C. § 11411(b)(2), 11411(e)(2). And

their general allegations that the federal Defendants have left the Act "unutilized since 1987," SAC ¶110, does not give rise to a claim absent a showing that they lawfully applied to use the property and were wrongly refused.

#### 5. Plaintiffs Fail to Establish a Violation of their Constitutional Rights under the Due Process Clause and Equal Protection Clause

**\*8** Plaintiffs' assert multiple constitutional claims actionable under 42 U.S.C. § 1983 which Defendants seek to dismiss.

##### a. *Plaintiffs Fail to Establish a Violation Under the Due Process Clause*

As a threshold matter, Plaintiffs' Fifth Amendment claims against the state Defendants fail as a matter of law because the Fifth Amendment only restricts the power of the federal government and does not apply to the actions of state agencies. *See, e.g. Citizens of Health v. Leavitt*, 428 F.3d 167, 178 n. 11 (3d Cir 2005) ("In a due process claim brought under the Fifth Amendment, the 'State' in the state action analysis is the federal government") (quoting *Malloy v. Hogan*, 378 U.S. 1, 26 (1964)).

Turning to Plaintiffs' Fourteenth Amendment claims, when a plaintiff sues under the Fourteenth Amendment, courts "employ the 'familiar two-stage analysis,' inquiring (1) whether 'the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property;' and (2) whether the procedures available provided the plaintiff with 'due process of law.' " *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (internal citation omitted). *See also* U.S. Const. amend. XIV § 1; *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006).

Here, Plaintiffs claim that Defendants violated their due process rights by "allowing encampments in some areas, but denying it to Plaintiff(s) herein, without appropriate process." SAC ¶108. This argument fails because Plaintiffs do not have a lawful property interest in 2376 N. Howard Street entitling them to due process. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("reasoning that [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate

claim of entitlement to it.").[17] Although the Court understands Plaintiffs' moral belief that they are entitled to "abandoned" housing regardless of their ability to pay, they do not have a legal property interest in 2736 N. Howard Street. As a result, Plaintiffs cannot claim their rights are violated merely because they are asked to leave.

b. *Plaintiffs Fail to Establish a Violation Under the Equal Protection Clause*

Plaintiffs' equal protection claim similarly fails. To bring a successful claim of denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. *Batson v. Kentucky*, 476 U.S. 79, 93 (1986). Because a state is restrained from "treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citation omitted), Plaintiffs can prevail by showing that they "receiv[ed] different treatment from that received by other individuals similarly situated." *Kuhar v. Greensburg-Salem School Dist.*, 616 F.2d 676, 677 n. 1 (3d Cir. 1980).

**\*9** Plaintiffs allege that Defendants violated equal protection by treating them differently from other individuals experiencing homelessness in Philadelphia, and Defendants can articulate no rational basis for the difference in treatment. SAC ¶109. According to Plaintiffs, individuals living in encampments across Philadelphia were either allowed to remain in the encampments or subsequently received housing pursuant to a settlement between the city of Philadelphia and members of those encampments, whereas here the Plaintiffs face eviction from the property and have not received a settlement promising alternate housing. *Id.* ¶¶107-109. In Plaintiffs' view: "When the Defendant(s) entered into settlements with the homeless encampments, as aforementioned, it agreed by its very terms, and implicitly so, to treat a segment of the population (i.e. those on the Parkway, and in front of PHA headquarters), differently than those outside those areas, such as Plaintiff(s) herein, and had no rational basis for doing so." *Id.* ¶109.

It is true that the government cannot provide a benefit to some (i.e. housing) and not to others in a way that violates equal protection. Here, however, Plaintiffs have failed to plead facts sufficient to show that the individuals living in the encampments are similarly situated to the plaintiffs here. Individuals are "similarly situated" under the Equal Protection Clause when they are alike "in all relevant aspects." *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (citing *Nordlinger*, 505 U.S at 10).

Settlements arise out of the specific circumstances of each case.[18] The City has not established a program that is available to some homeless citizens but not others.[19] Instead, it entered into an agreement to resolve a unique dispute where an important and major thoroughfare of the City was seriously affected. There is no logical basis on which to compare the decision to resolve that crisis to every other instance of homelessness. And a decision by a public entity to settle one case can hardly set an equal protection benchmark for every other dispute involving potentially related issues. Similarly, as to the federal defendants, the fact that different individuals experiencing homelessness are provided with different levels of services simply does not suffice to establish a denial of equal protection. Plaintiffs' claim therefore fails as a matter of law.

**6. Plaintiffs Fail to Establish a State Created Danger Claim**

Plaintiffs also assert a substantive due process claim under a state-created danger theory. *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996). Under a state-created danger theory, the state may be subject to liability when it "acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of state intervention." *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003).

To prevail on a state-created danger theory, Plaintiffs must prove the following four elements:

1) the harm ultimately caused was foreseeable and fairly direct;

2) a state actor acted with a degree of culpability that shocks the conscience;

3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

**\*10** 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (citations and internal quotation marks

omitted).

Plaintiffs argue that Defendants have "affirmatively created or increased the risk that plaintiff(s) would be exposed to dangerous and/or deadly conditions," SAC ¶113, and knew or should have known that their actions or omissions (i.e. threatened eviction) endangered plaintiffs, yet were deliberately indifferent to the consequences, i.e. the threat of COVID-19 and the harms stemming from housing insecurity. *Id.* ¶114.

As an initial matter, to the extent that the thrust of Plaintiffs' theory is that the City did not make effective use of resources, that would represent a *failure* to act, not an affirmative use of authority. If Plaintiffs' ground their claim in the City's intent to evict, it bears mention that the City's action is a response to the illegal occupation of the property. To deem the City's pursuit of legal remedies available to any property owner to be a "state created danger" would extend that doctrine to extraordinary lengths.[20]

In addition, it cannot be said that the City's conduct rises to the level of outrageous behavior that shocks the conscience. Homelessness has proven to be an intractable problem, and there is much to criticize in the failure of government at every level to address it more effectively. If habitable properties reserved for public housing are not being used to shelter families in the midst of a deadly pandemic, there is a strong argument that this is a failure of public policy.[21] But such a shortcoming would at most constitute negligence.

And the state-created danger doctrine provides a narrow path for establishing a due process violation. The Supreme Court has made clear that the Due Process clause "generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County. Dep't of Social Servs.*, 489 U.S. 189, 195-96, 202 (1989). *See also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("[w]e do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality.")

*11 My hope and expectation is that any eviction of the Plaintiffs would be accompanied by an appropriate offer of services. But I cannot hold that the City would violate the Constitution by asserting its right of control over the property.

### 7. Because Plaintiffs have not successfully pled an underlying violation of federal law, their *Monell* claim fails

To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that the municipality, through the implementation of a policy or custom, caused the underlying constitutional violation. *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (2018). Plaintiff must demonstrate a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

There can be no claim under *Monell* in the absence of an underlying violation of civil rights. *City of Los Angeles v. Heller*, 475 US. 796, 799 (1986); *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (dismissal of § 1983 claims against Mayor required dismissal of *Monell* claims based upon the same factual allegations of unlawful conduct). The *Monell* claim must therefore also be dismissed.

### 8. Plaintiffs Fail to Establish a Claim under the Declaratory Judgment Act

Because the Court finds that Plaintiffs have not established violations of their constitutional or statutory rights, Plaintiffs' claims pursuant to the Declaratory Judgment Act must also be dismissed.

### IV. Conclusion

Plaintiffs state a strong case of unmet needs. Their Complaint succeeds in focusing attention on the crisis of homelessness. But wholly apart from the conclusory nature of many of the allegations, the fundamental deficit is Plaintiffs' failure to assert any legally cognizable causes of action. Plaintiffs have amended twice, and I am convinced that further amendments would be futile. ECF 13, 31. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) ("Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility.") The action will therefore be dismissed with prejudice.

Honkala v. U.S. Department of Housing and Urban Development, Slip Copy (2022)

Slip Copy, 2022 WL 282912

An appropriate order follows.

**All Citations**

Footnotes

1   *See* The U.S. Department of Housing and Urban Development, 2020 Annual Homeless Assessment Report (AHAR) to Congress (Part 1).

    Plaintiffs cite to various sources regarding the homelessness crisis in Philadelphia and the United States, and the racially disparate impact of the crisis in Philadelphia, some of which the Court cites herein. *See* SAC ¶¶18-41. The Court also takes judicial notice of "matters of public record" which include published reports of administrative bodies. *See Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1197 (3d. Cir. 1993).

2   *See* Philadelphia Office of Homeless Services, Methodology for PA-500 Philadelphia Continuum of Care (2019).

3   *See* Philadelphia Office of Homeless Services, Philadelphia Annual Point-In-Time Count (2018).

4   *See* The U.S. Department of Housing and Urban Development, *supra* note 1.

5   The Nat'l Low Income Hous. Coal., 2021 Report: Extremely Low-Income Renters Face Shortage of 7 Million Affordable and Available Homes, 3/22/2021.

6   *See* The Centers for Disease Control and Prevention, Interim Guidance on People Experiencing Unsheltered Homelessness, 11/4/2021.

7   *See* Philadelphia Housing Authority, Information on Admissions to Public Housing Program., available at http://www.pha.phila.gov/housing/admissions.aspx.

8   Plaintiffs allege that HUD owns the property, SAC ¶6, 45, but that allegation is incorrect, as noted by Federal Defendants in their motion to dismiss. ECF 34 at 2. Plaintiffs do not contest that PHA owns the property, in trust for the benefit of HUD, in their Answer to Federal Defendant's Motion to Dismiss. "Plaintiffs occupied the property located at 2736 N. Howard Street, Philadelphia PA ... because it has long since been abandoned by its owner of record, (Defendant PHA and/or HUD herein)." ECF 35 at 3.

9   Plaintiffs submit that "despite the existence of approximately eight (8) abandoned properties in Philadelphia for everyone (1) homes person," Defendants "have utterly no plans to utilize these public resources to ameliorate the coming public health and housing crisis wrought by the Covid-19 pandemic ..." SAC ¶30.

Honkala v. U.S. Department of Housing and Urban Development, Slip Copy (2022)

10    The federal defendants bring their motion under 12(b)(6) and under 12(b)(1) for lack of subject matter jurisdiction. They allege that this Court should dismiss Plaintiffs' claims because Plaintiffs lack standing against them with respect to the claims arising out of the eviction notice, because the PHA, not the federal defendants, sought to remove Plaintiffs from the property. *See* Fed. Def.'s Mot. To Dismiss at 9, ECF 34. For the sake of simplicity, the Court considers all claims under 12(b)(6).

11    Plaintiff's SAC also included a claim under the Abandoned and Blighted Property Conservatorship Act, 68 P.S. §§ 1101 et seq, but Plaintiffs have withdrawn that claim. *See* Pls.' Answer to Fed. Defs.' Mot. to Dismiss at 7, ECF 35.

12    Most of Plaintiffs' claims refer to "Defendant(s)" generally without specifying which Defendants are responsible for the alleged actions and/or inactions. Plaintiffs apparently seek to overcome this deficit by including conclusory allegations of conspiracy. They broadly allege that "at any and all times relevant, each of the Defendants was an agent, employee, and co-conspirator of the remaining Defendants, and in participating in the acts alleged in this Complaint, acted within the scope of such agency and employment, in furtherance of the conspiracy, and with the permission and consent of the co-conspirator Defendants." SAC ¶54. They do not plead allegations that would support the existence of a conspiracy.

13    The Federal Judicial District also alleges that it is entitled to Eleventh Amendment immunity, as well as immunity under the Sovereign Immunity Act, that Plaintiffs' Section 1983 claims must be dismissed because the FJD is not a "person" subject to suit, and that Plaintiffs' RFRA claims must be dismissed because the FJD is a state entity. Def. FJD's Mot. to Dismiss at 3. I need not reach these arguments as I hold that Plaintiffs have failed to state a claim with respect to the FJD.

14    "Plaintiff(s) ... have resided at the property at issue since August of 2020, said residency being procured by Plaintiff(s) Cheri Honkala and PPEHRC, who have provided the resources and/or labor to rehabilitate said property to a degree that is currently fit for human habitation, despite the condition the property had been left in by Defendant(s)." Pls.' Answer to Def. PHA's Mot. to Dismiss at 5. *But see* SAC Exhibit A, Notice to Vacate which notes that "[t]he property has been marked for rehabilitation because it is not safe for occupancy."

15    For the reasons discussed above, Plaintiffs claims against the FJD fail, so I do not consider the RFRA claims against the FJD here.

16    Plaintiffs appear to argue that a means of enforcing the rights set out in the McKinney Vento Act exists under 42 U.S.C. § 1983. *See* SAC ¶¶ 105-111. In *Lampkin v. District of Columbia*, 27 F.3d 605, 611-12 (D.C. Cir. 1994), the Court found that although the McKinney Act contains no statutory mechanisms for the administrative enforcement of the beneficiaries' rights, individuals may use § 1983 to enforce those rights. However, that case concerned 42 U.S.C.A. §§ 11301 et seq, pertaining to the education of homeless children, whereas a different section of the McKinney Vento Act is at issue here. With respect to this section of the McKinney Vento Act, 42 U.S.C.A. § 11411, no court has held that individual plaintiffs can use 42 U.S.C. § 1983 to enforce its provisions.

Courts have also reviewed the decisions of the Department of Health and Human Services (HHS) to determine whether an agency's decision to deny an application for use of surplus property, under 42 U.S.C.A. § 11411, was arbitrary and capricious, which is not at issue here given that plaintiffs fail to plead that they applied for – and were denied access to – available surplus property to assist homeless individuals. *See New Life Evangelistic Center v. Sebelius*, 672 F.Supp 2d 61, 70 (D.D.C. 2009); *Colo. Coalition for Homeless v. General Services Admin.*, No. 18-cv-1008-WJM-KLM, 2018 WL 3109087, *7 (D. Colo, June 25, 2018).

17    Although an occupier of land may assert a property interest acquired through adverse possession, adverse possession is not at issue here for a variety of reasons, the two most obvious being that Plaintiffs have not lived on the land continuously for 21 years, the statutory period required in Pennsylvania, *see P.S.* §§ 81-88; *Flannery v. Stump*, 786 A.2d 255, 258 (Pa. Super. 2001), and that "a claim of title by adverse possession does not lie against Commonwealth property." *City of Philadelphia v. Galdo*, 181 A.3d 1289, 1292 (Pa. Cmmw. 2018), *aff'd*, 217 A.3d 811 (Pa. 2019) (citing *Dep't of Transp. v. J. W. Bishop & Co.*, 439 A.2d 101, 103 (Pa. 1981)).

18    The Court takes judicial notice of the City of Philadelphia's statements regarding agreements reached to end the encampments. The Statement issued by the City of Philadelphia regarding the City, PHA and JTD Camp Representatives Agreement to end the Parkway Encampment states that "the City and PHA will transfer a total of 50 properties to a land trust established by the encampment residents" among other agreed-to terms.

19    In that regard, Plaintiffs have not pled that they are ineligible to benefit from the settlement agreements reached between members of the encampment and the City of Philadelphia.

20    Plaintiffs also allege that Philadelphia entities – specifically the Philadelphia Police Department, Philadelphia Department of Human Services, Philadelphia Sheriff's Office, and the First Judicial District – have threatened to remove the minor plaintiffs to foster care, SAC ¶¶57, 58 n. 2. Vague allegations of possible *future* action do not suffice to establish a presently existing "state created danger."

21    Nationally, one impediment to increased public housing is the Faircloth Amendment to Section 9(g)(3) of the Housing Act of 1937, passed as part of the Quality Housing and Work Responsibility Act of 1998. It prohibits the use of federal funds to expand the number of public housing limits. That does not account for a shortfall in Philadelphia, which has a Faircloth limit of 20,133 units, https://www.hud.gov/sites/dfiles/PIH/documents/Faircloth%20List_11-30-20.pdf, but only 14,000 units currently available. http://www.pha.phila.gov/. A more likely cause is flat federal funding. *See* Budget Trends, NLHC, https://nlihc.org/federal-budget-and-spending.

End of Document                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.