UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETTER DAYS AHEAD OUTREACH, INC., et al. | : : : : | |
| Plaintiff, | : : | No. 2:23-CV-04234 |
| v. | : : : | JURY TRIAL DEMANDED |
| POTTSTOWN BOROUGH, | : : : | |
| Defendant. | : : | |

**DEFENDANT BOROUGH OF POTTSTOWN'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)**

Defendant, Borough of Pottstown ("Pottstown"), by and through its undersigned counsel, Siana Law, LLP, submits this Memorandum of Law in Support of its Motion to Dismiss and avers as follows:

### I.  BRIEF PROCEDURAL HISTORY

Plaintiffs, Beltran, Wanner, and Better Days Ahead, Inc., commenced this civil rights action against Pottstown, only, asserting violations of their Eighth and Fourteenth Amendment rights resulting from Pottstown's Notice that inhabitants of a homeless encampment along the Schuylkill River is required to vacate.[1] (Cmplt., ECF 1).  Plaintiffs thereafter filed a Motion for Preliminary Injunction, which is fully briefed, and a hearing was held on November 16, 2023.  This Court has taken the ruling under advisement. (See, ECF 4,15,17,20).

### II.  BRIEF FACTUAL SUMMARY

Taking the *factual* allegations of the Complaint as true, for purposes of this Motion only

---

[1] On November 16, 2023, Mr. Beltran provided sworn testimony that he no longer resides at the encampment.

without admitting the same, the following is asserted:

### A. Background

Plaintiffs estimate there are approximately 568 unhoused persons in Montgomery County in January 2022. (Cmplt. ¶ 9). In January 2023, Montgomery County located approximately 41 unhoused persons living outside in Pottstown. (Cmplt. ¶ 11). Plaintiffs estimate that 75-95 unhoused persons reside in Pottstown. (Cmplt. ¶ 12). Pottstown and Montgomery County do not have enough shelter beds to house Pottstown's unhoused residents. (Cmplt. ¶ 13). Beacon of Hope[2], a church-based warming center program in Pottstown, offers up to 35 warming beds on a first come, first served basis. The warming beds are not enough to meet the needs for overnight beds in the Pottstown community. (Cmplt. ¶ 15). Between December 2022 and March 2023, Beacon of Hope is estimated to have turned away 3-8 unhoused people each night, unless Montgomery County's Code Blue Program was implemented. (Cmplt. ¶ 16). Most Unhoused residents have no choice but to sleep outside. (Cmplt. ¶ 18). The Pottstown Police Department has repeatedly conducted sweeps of homeless encampments in the Borough over the past two years, ordering unhoused residents to relocate with limited notice and without offer of alternative housing. (Cmplt. ¶¶ 20, 21). During past sweeps, Pottstown offered to store unhoused residents' property. (Cmplt. ¶ 22). Plaintiffs assert that Pottstown has taken an aggressive stance toward unhoused residence, seeking to block or impede Beacon of Hope from providing overnight beds to unhoused residents. (Cmplt. ¶ 23). Pottstown has issued a press release advising that its "Zoning Ordinance does not permit homeless shelters to operate within the Borough." (Cmplt. ¶ 25).

Beacon of Hope will be required to rotate its warming beds each month to five different churches (between November 1, 2023 to May 21, 2024, "shelter season"). (Cmplt. ¶27) Beacon of

---

[2] Beacon of Hope is not a party to this matter.

Hope will have less beds overall (Cmplt. ¶ 28).

### B. Encampment

Approximately 25 unhoused residents live on Pottstown's owned land adjacent to the Schuylkill River Trail. (Cmplt. ¶ 29). Pottstown informed Access Services (not a party) that it would be closing the Encampment, and the residents would need to relocate. (Cmplt. ¶ 31). Pottstown advised Access Services it would be warning unhoused residents they may be arrested for trespass if they remain at the Encampment after its closure. (Cmplt. ¶ 32). Officer Guth of the Pottstown Police Department informed Access Services and Plaintiff Beltran that the Encampment will be closing in or around November or December 2023. (Cmplt. ¶ 33). No offer of alternative housing was provided to Mr. Beltran by Officer Guth. (Cmplt. ¶ 35). Pottstown informed Access Services and Beacon of Hope in an October 2, 2023 meeting that it will be closing the Encampment in or about December 2023.

Discussion was held at the October meeting with Pottstown requesting Access Services and Beacon of Hope to assist the Encampment residents to find alternative housing. (Cmplt. ¶ 37). Access Services and Beacon of Hope advised it would be impossible because there is not adequate shelter space. (Cmplt. ¶ 38). Beacon of Hope advised it could not prioritize the Encampment residents, a request made by Pottstown. (Cmplt. ¶¶ 39, 40). Pottstown advised it would proceed with the closure. (Cmplt. ¶ 41).

Pottstown placed placards in October 2023 near the Encampment advising that the property would be closed after December 1, 2023 and that individuals are not permitted to use the property for any reason. (Cmplt. ¶ 42). The sign provides the words, "No Trespassing." (Cmplt. ¶ 43). In addition, the residents are advised to call 2-1-1 or the Montgomery County Mobile Crisis to assist in finding alternative shelter. (Cmplt. ¶ 44). Pottstown is not making shelter available. (Cmplt. ¶

45).  The 2-1-1 Center connects to a call center for Montgomery County residents experiencing homelessness.  Montgomery County currently has no shelter available but provides a waitlist of 3-6 months for hotel beds, depending on the unhoused residents' particular vulnerability factors. (Cmplt. ¶¶ 46, 47).  Beacon of Hope's warming beds are on a first come, first served basis. (Cmplt. ¶ 49).  The closure of the Encampment means that some or all of the unhoused residents will be forced to locate to other outdoor spaces. (Cmplt. ¶ 51).

### C.  Alfredo Beltran

Mr. Beltran no longer resides at the encampment.  (11/16/23 Hearing).  He became unhoused in 2022 and lived at the encampment in 2023. (Cmplt. ¶53). Beltran relocated twice before, one in Pottstown, one outside of Pottstown. (Cmplt. ¶54). He "fears" he will need to find another outdoor location because no long term shelter is available. (Cmplt. ¶56). He is afraid and has fears that if he relocates he will be at a greater risk of crime and may be separated from his property.  (Cmplt. ¶58,59).

### D.  Daniel Wanner

Mr. Wanner became unhoused in or around November 2022 and began to reside at the Encampment in or about the Summer of 2023. (Cmplt. ¶ 62).  Mr. Wanner is unable to work. (Cmplt. ¶ 63).  Mr. Wanner previously relocated twice from sites around the Stanley G. Flagg Company, property located along the border of Pottstown and West Pottsgrove. (Cmplt. ¶ 64).

Mr. Wanner lost belongings when relocating. (Cmplt. ¶ 65).  If ordered to relocate, Mr. Wanner would likely find another outdoor space to live and would be at greater risk of crime and lose the support he receives from residents at the Encampment. (Cmplt. ¶¶ 66, 67).  Mr. Wanner fears he will be separated from his property, including his tent, clothes, bedding, and family photographs if he must relocate. (Cmplt. ¶¶ 68, 69).

### E. Better Days Ahead, Inc.

Better Days Ahead, Inc. ("BDA") is a non-profit organization with a mission of aiding unhoused residents in Pottstown <u>and</u> other Southeastern Pennsylvania municipalities. This includes distributing food and supplies to unhoused residents at the Encampment. (Cmplt. ¶ 72). Volunteers from BDA visit the Encampment approximately twice a month to distribute food, tents, clothing, and other critical supplies. (Cmplt. ¶ 73). They estimate that half of the unhoused residents rely on tents supplied by BDA. Past sweeps by "Southeastern Pennsylvania municipalities" (not identified) have frustrated their mission by making it "more difficult" to provide life sustaining resources; requires them to divert resources to supply unhoused residents with new tents; and to spend time and energy finding the residents after they have relocated. (Cmplt. ¶¶ 75-77). BDA claims its mission will be frustrated "by making it more difficult" to locate and serve the residents of the Encampment. Additionally, new tents would have to be distributed. (Cmplt. ¶ 79).

### III.   LEGAL ARGUMENT

#### A.   Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b) tests the legal sufficiency of the complaint. *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir. 1987). A motion to dismiss for failure to state a claim may be granted if, after accepting all well-pleaded facts in the complaint as true and viewing them in the light most favorable to the non-moving party, plaintiff is not entitled to relief. *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint need not contain detailed factual allegations, it must have more than unadorned, "defendant-unlawfully-harmed-me" type of

5

accusations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A district court must engage in a two-step inquiry to determine the sufficiency of the facts alleged in a complaint:

> First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Iqbal*, 129 S. Ct. at 1949. Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege a plaintiff's entitlement to relief . . .. As the Supreme Court instructed in *Iqbal*, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1949.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The assumption of truth does not apply to legal conclusions couched as factual allegations, or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949.

Where, as here, the complaint contains only generalized averments of wrongdoing "without some further factual enhancement" it "stops short of the line between possibility and plausibility" of entitlement to relief. *Twombly*, 550 U.S. at 554.

### B. No Underlying Constitutional Violation is Alleged, Requiring Dismissal

Under *Monell v. Department of Social Services of the City of New York*:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. 658, 694 (1978). *Monell* liability may be based upon a formal government policy or an informal custom so pervasive as to virtually constitute law. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990).

6

To establish a *Monell* claim, "Plaintiff must demonstrate a "direct causal link between a municipal policy or custom and the alleged unconstitutional deprivation." *Honkala v. U.S. Department of Housing and Urban Development*, 2022 WL 282912 (E.D. Pa. 1/31/2022), *11, citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). The initial question here, as in any §1983 action, "is whether the plaintiff has alleged a deprivation of a constitutional right at all." *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003).

In order for a municipality to be liable under *Monell* there must be an underlying constitutional violation upon which that liability is based. *Mullholland v. Government County of Berks, Pa.*, 706 F.3d 227, 238 n. 15 (3d Cir. 2013) ("It is well settled that, if there is no violation on the first place, there can be no derivative municipal claim."). Simply stated, there can be no *Monell* claim in the absence of an underlying violation of civil rights. See also, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006); and *Williams v. Borough of West Chester*, 891 F.2d 458, 467 (3d Cir. 1989.)

A review of the Complaint fails to reveal any individually named defendants or individual claims for civil rights liability. Therefore, as a matter of law, there can be no underlying violation; and no derivative municipal claim. Furthermore, even assuming Plaintiffs get over this hurdle (which is denied) Plaintiffs failed to assert a *Monell* claim; or allege sufficient *factual* allegations of violations of policy, custom or practice to support a *Monell* claim. As a result, Pottstown is entitled to dismissal; and as the only defendant, Plaintiffs' Complaint must be dismissed.

### C. Better Days Ahead Lacks Standing.

Article III, Section 2, Clause 1 provides for standing in federal claims, the burden of which is upon plaintiff. *Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 291 (3d Cir.2005) (citing Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir.2003))*. The elements for

standing include:

> (1) the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Blunt v. Lower Merion School District,* 767 F.3d 247 (3rd Cir. 2014) citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). An injury is concrete if it will affect a plaintiff in a personal and individual way. Two counts are asserted: (1) Eighth Amendment Violation; and (2) 14th Amendment State Created Danger. (ECF 1) Based upon the factual allegations asserted, BDA does not have a plausible claim for relief where it has suffered no injury – actual or imminent.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Constitution, Amendment VIII. Plaintiffs' claims are based upon allegations that the Borough advised Access Services that "residents" who remain at the encampment after December 1, 2023 may be arrested for trespass. (Compl. ¶82). That it is cruel and unusual to "punish or threaten to punish citizens…for sleeping" (Compl. ¶ 84); and without the injunctive relief, the "Unhoused Plaintiffs" Eighth Amendment rights would be violated. (Compl. ¶ 85).

BDA is not a resident or an unhoused plaintiff. Rather, BDA is a non-profit organization with a mission to aid unhoused residents "in Pottstown and Southeastern PA municipalities, including by distributing food and supplies to unhoused residents…" (Compl. ¶ 5). As an organization it is not subject to arrest or the threat of arrest for trespass. Therefore, BDA has no concrete injury – actual or imminent based upon the Eighth Amendment.

As it relates to the State Created Danger Claim, Plaintiffs likewise allege that requiring the unhoused residents to leave the encampment will disperse "residents" without adequate resources

or shelter; and create a foreseeable danger to "Unhoused Plaintiffs". (Compl. ¶¶ 90, 91). Likewise, BDA has no concrete injury, actual or imminent pursuant to the Fourteenth Amendment State Created Danger Doctrine.

In a veiled attempt to support standing as to both claims, BDA alleges in a conclusory fashion, that its mission would be "frustrated"; and it would be forced to "divert its resources". (Compl. ¶¶ 86, 93). Frustration, nor the diversion of resources, qualifies as a concrete injury for standing purposes; nor do the allegations support a plausible claim for relief.

To the extent BDA claims standing as an organizational plaintiff, this too fails. First, Plaintiffs rely upon *Havens Realty Corp. v. Forman*, 455 U.S. 363 (1982) for the proposition that it has organizational standing. This is misplaced where *Havens Realty* determined standing based upon § 812 of the Fair Housing Act, not at issue here. The statutory authority that permitted standing in *Havens Realty* is non-existent here.

An organization *may* have standing to seek judicial relief from injury to itself or an organization may assert claims on behalf of its members, where its members have standing. *Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009). Here, there are no allegations the unhoused residents are members. Furthermore, an organization's mere 'interest in a problem,' no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved.' *Blunt* at 279 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). "In deciding organizational standing questions after *Havens*, appellate courts have generally agreed that where an organization alleges or is able to show – depending on the stage of the proceeding – that it has devoted additional resources to some area of its effort in order to counteract discrimination, the organization has met the Article III standing requirement." *Id*. at 78. "An organization may establish a 'concrete and

demonstrable injury' sufficient to confer standing if a defendant's actions 'perceptibly impair' the organization's ability to provide services." *Blunt*, 767 F.3d at 285 (quoting *Havens Realty,* 455 U.S. at 378-79). Here, there is no impairment alleged; nor the devotion of 'additional' resources to counteract discrimination.  BDA's mission remains the same.

Additionally, this Circuit has failed to find standing when an organization is "injured" by simply engaging in its typical, day-to-day activities in furtherance of its purpose. *See Blunt* at 247 (finding no standing where organizational plaintiff's "alleged additional expenditures were consistent with [its] typical activities, and it is thus unclear the effect, if any, that this litigation had on their expenditures"); and *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141, F.3d 71, 78 (3d Cir. 1998) (standing rejected where plaintiff failed to show it had altered its operations as a result of the unlawful action it was challenging). BDA will continue to perform its mission, aiding unhoused residents and distributing food and supplies. No facts have been alleged to support a plausible claim for relief where any no alteration of operations are asserted; and they would continue with their mission.  See, *Iqbal/Twombly*.

### D. Eighth Amendment Claim Fails

Plaintiffs' reliance on the Ninth Circuit's holding in *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019)  that it is a violation of one's Eight Amendment Rights to impose criminal penalties for sitting, sleeping, or lying on public property for homeless individuals who can't find shelter fails for several reasons.  *Martin* at 616-617.  First, no courts in the Third Circuit have referenced, cited, or adopted this narrow holding interpreting a California municipality's anti-camping ordinance.  Second, the underlying claim in *Martin* was an attack on an **ordinance**.  Here, Plaintiffs do not attack *any* ordinance.  Not a single ordinance or criminal code is cited within the Complaint, nor is any claim asserted attacking the constitutionality of any ordinance. (See, Cmplt).

10

Third, Plaintiffs allege that the Pottstown Police Department advised Access Services, a non-party, that residents "may" be arrested for trespass if they remain at the encampment after its closure. (Compl.¶ 32). No threat of arrest is alleged to have been made to either individual plaintiff due to their homeless status. See, Complaint.

Fourth, even assuming *Martin* is good law in this Circuit, which is denied, the prohibition in *Martin* is a narrow one and one which only prohibits citations for a violation of the camping ordinance if no housing is available. *Martin* at 617. Nor does *Martin* holding impose an obligation upon Pottstown to make shelters available.

Plaintiffs allege that Beacon of Hope provides a seasonal warming center and that they will have beds available. The warming centers will be rotating in different churches within Pottstown. Plaintiff also alleges Montgomery County provides hotel rooms, albeit with a waiting list. Beltran and Wanner allege that no 'long term shelter' is available to them right now. (Cmplt. ¶56,66). Not only is this a conclusory allegation without factual support but it fails to support that they sought shelter and were denied (making their homelessness involuntary – per *Martin*). Therefore, they have not alleged facts sufficient that they have no choice in residing in the outdoor encampment.

A more recent 9th Circuit case affirmed the narrowness of Martin's holding - in remanding to the district court: "the district court should narrow its injunction to the anti-camping ordinances and enjoin enforcement of those ordinances only against involuntary homeless person for engaging in conduct necessary to protect themselves from the elements when there is no shelter space available." *Johnson v. City of Grants Pass*, 72 F.4th 868, 896 (9th Cir. 2023). The conclusory allegation that no shelter is available at this time fails to meet the narrow *Martin* standard.

Pottstown denies that *Martin* is controlling; or that the facts pled support relief pursuant to

*Martin*. Furthermore, as there is no claim that some ordinance is unconstitutional; Plaintiffs fail to assert a plausible claim for relief against Pottstown based upon the Eighth Amendment.

> **E. Plaintiffs Fail to Meet the Necessary Requirements of a State Created Danger Claim (14th Amendment).**

To establish a state-created danger claim under § 1983, a plaintiff must plead:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Henry v. City of Erie*, 728 F.3d 275, 282 (3d Cir. 2013). See also *Morrow v. Balaski,* 719 F.3d 160, 177 (3d Cir. 2013). Plaintiffs fail to meet any of the necessary elements.

Under a state-created danger theory, the state may be subject to liability when it "acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of state intervention." *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003). As noted by Judge McHugh dismissing a similar state created danger claim (evicting homeless from a property owned by the Philadelphia Housing Authority ("PHA")):

>> And the state-created danger doctrine provides a narrow path for establishing a due process violation. The Supreme Court has made clear that the Due Process clause "generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County. Dep't of Social Servs.*, 489 U.S. 189, 195-96, 202 (1989). *See also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("[w]e do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality.

*Honkala v. U.S. Department of Housing and Urban Development*, 2022 WL 282912 *10 (E.D.

*Martin*. Furthermore, as there is no claim that some ordinance is unconstitutional; Plaintiffs fail to assert a plausible claim for relief against Pottstown based upon the Eighth Amendment.

### E. Plaintiffs Fail to Meet the Necessary Requirements of a State Created Danger Claim (14th Amendment).

To establish a state-created danger claim under § 1983, a plaintiff must plead:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Henry v. City of Erie*, 728 F.3d 275, 282 (3d Cir. 2013). See also *Morrow v. Balaski,* 719 F.3d 160, 177 (3d Cir. 2013). Plaintiffs fail to meet any of the necessary elements.

Under a state-created danger theory, the state may be subject to liability when it "acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of state intervention." *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003). As noted by Judge McHugh dismissing a similar state created danger claim (evicting homeless from a property owned by the Philadelphia Housing Authority ("PHA")):

> And the state-created danger doctrine provides a narrow path for establishing a due process violation. The Supreme Court has made clear that the Due Process clause "generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County. Dep't of Social Servs.*, 489 U.S. 189, 195-96, 202 (1989). *See also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("[w]e do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality.

*Honkala v. U.S. Department of Housing and Urban Development*, 2022 WL 282912 *10 (E.D.

Pa. 1/31/2022), attached hereto marked Exhibit "A". The *Honkala* Court determined plaintiffs therein, illegally residing in a PHA property, failed to establish a state created danger.

### 1. No Foreseeability of Harm.

To adequately establish foreseeability, Plaintiffs must "allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips v. Allegheny County*, 515 F.3d 224 at 238. Significantly, "[s]tate actors are not liable every time their actions set into motion a chain of events that result in harm." *Henry at* 283. If the connection between the action and the harm is "too attenuated . . . to support liability," there is no foreseeability. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997). There must be a specific harm to a specific individual that was foreseeable. *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996).

Plaintiffs allege nothing more than conclusory allegations to support foreseeability. "As described above, this creates a foreseeable danger to Unhoused Plaintiffs." (Cmplt. ¶91). Such threadbare allegations fail to support foreseeability, much less a plausible claim for relief. Furthermore, "fears" of being separated from property (Beltran: ¶ 59,60; Wanner: Cmplt. ¶69,70) are nothing more than bald assertions too attenuated to support liability, especially where Pottstown has offered to store belongings. The allegations of being "afraid" of a greater risk of crime likewise fail to support foreseeability upon their relocation. (Cmplt. ¶ 58). Like Judge Robreno's ruling in the *Murray* decision, "Therefore, the future harm Plaintiffs describe relies on a speculative and attenuated chain of causation that is unlikely to constitute "foreseeable and direct" harm." *Murray v. City of Philadelphia*, 481 F.Supp.3d 461, 475 (E.D.Pa. 2020); Plaintiffs herein describe future harm based upon speculation which is unlikely to constitute foreseeable and direct harm.

### 2. No Conscious Shocking Conduct.

The second element requires a plaintiff to sufficiently plead facts to establish that "a state actor acted with a degree of culpability that shocks the conscience." *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006). The Supreme Court has rejected that tort liability rises to the level of conscience shocking conduct, holding that the Constitution does not guarantee due care on the part of state officials. *County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998).

Courts have focused on two standards that satisfy the "shocks the conscience" test: (1) intent to harm, and (2) deliberate indifference. *Lewis*, 523 U.S. at 848-50; *Sanford v. Stiles*, 456 F.3d 298, 306 (3d Cir. 2006). The intent to harm standard requires a showing that an official acted "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 853. The deliberate indifference standard requires that a person consciously disregard a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

Concern for the safety and welfare of inhabitants residing on Pottstown's property cannot be deemed to shock the conscience under any standard. There is no intent to harm; but to act for their safety. Furthermore, deliberate indifference cannot be established as they are not consciously *disregarding* a substantial risk of harm. Rather, Pottstown is attempting to <u>prevent</u> injury or death to the unhoused residents living on a FEMA designated floodway on property owned by Pottstown. Additionally, "[t]o deem the City's pursuit of legal remedies available to any property owner to be a "state created danger" would extend that doctrine to extraordinary lengths." *Honkala* at *10.

### 3. No Affirmative Act By Pottstown Results in Harm

Plaintiffs must show that (1) the state actor exercised his or her authority; (2) the state actor took an affirmative action; and (3) the act either created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. *Ye v. United States*, 484

14

F.3d 634, 638-43 (3d Cir. 2007). "[I]t is misuse of authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282.

If Pottstown fails to act, the danger to the unhoused residents could be injury or death from flooding. This is a greater danger than if no action is taken. Therefore, the notice to relocate has not put the unhoused residents at a greater risk of danger.

### 4. No Irreparable Harm

Plaintiffs likewise have failed to allege sufficient facts to support irreparable harm.

### IV.   CONCLUSION

For the reasons set forth herein, Plaintiffs who have been asked to leave flood prone Borough property, do not have a legal property interest, and cannot claim their rights are violated because they are asked to leave. More specifically, the allegations fail to support an Eighth Amendment or a Fourteenth Amendment State Created Danger Claim.

Notwithstanding the above, the Complaint must be dismissed as a matter of law as there is no individually liability pled for which derivate liability against Pottstown may occur. Finally, Better Days Ahead lacks standing and must be dismissed, as a matter of law.

Respectfully submitted,

**SIANA LAW**

By:   */s/ Sheryl L. Brown*
Sheryl L. Brown, Esquire, I.D. #59313
Attorney for Defendant, *Pottstown Borough*
941 Pottstown Pike, Suite 200
Chester Springs, PA 19425
(P): 610.321.5500  (F): 610.321.0505
slbrown@sianalaw.com