## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BETTER DAYS AHEAD** | : | |
| **OUTREACH INC. et al,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **CIVIL ACTION NO. 2:23-CV-04234** |
| | : | |
| **BOROUGH OF POTTSTOWN,** | : | |
| | : | |
| **Defendant.** | : | |

**PEREZ, J.**                                                        **NOVEMBER 28, 2023**

### <u>MEMORANDUM</u>

Due to insufficient shelter capacity in Defendant Borough of Pottstown ("the Borough") and Montgomery County at large, homeless encampments have been erected in various locations throughout Pottstown-owned property and the surrounding area. Plaintiff Daniel Wanner is an unhoused person presently living outdoors on land next to the Schuylkill River Trail along College Drive, Pottstown, PA, also identified as 150, 160, and 320 Keystone Boulevard, Pottstown, PA (the "College Drive Encampment"). Plaintiff Better Days Ahead Outreach Inc. is a non-profit organization that provides aid to unhoused residents in Pottstown, including residents of the College Drive Encampment. Together, the Plaintiffs have brought a civil rights suit against the Borough and ask this Court to enjoin Defendant from closing the homeless encampment. Presently before the Court is Plaintiff's' Motion for Preliminary Injunction (ECF No. 4) and the Parties' responsive memoranda (ECF Nos. 15 & 20). Upon careful consideration of the motions, responses,

accompanying exhibits, testimony at the hearing and arguments of counsel, this Court holds that Plaintiff's Motion for Preliminary Injunction should be granted in part and denied in part.[1]

For purposes of the preliminary injunction assessment, the Court finds that Plaintiffs have established a likelihood of success on the merits for their Eighth Amendment claim, but have fallen short on the merits analysis for the state-created danger claim brought under the Fourteenth Amendment. Plaintiffs have demonstrated that they are subject to a credible threat of being arrested, cited, or prosecuted and potentially jailed for sheltering outdoors at the College Drive Encampment. Further, the Borough does not contest that there is a shortage of shelter space in Pottstown and Montgomery County generally. The issue here is with the manner in which the closure will be enforced.  This Court finds that the Borough may take steps to close the College Drive Encampment—however, Defendant may not do so through the imposition of criminal penalties. Aside from the threat of criminal sanctions, this Court finds that the record does not otherwise support a finding that Plaintiffs will suffer immediate and irreparable harm if the injunction, as requested, is not issued.

## I.      BACKGROUND

Despite a rise in homelessness throughout the region, Montgomery County presently lacks any permanent housing shelter for single adults. A significant portion of the unhoused population of Montgomery County resides in the Borough of Pottstown, which categorically prohibits the existence of homeless shelters through its zoning code. (See ECF 15, Exh. E). Neither the Borough nor Montgomery County at large have enough beds to shelter all of Pottstown's unhoused

---

[1] Plaintiffs filed their complaint on November 1, 2023 and a motion for preliminary injunction the following day. This Court held an evidentiary hearing on the earliest possible date, November 16, 2023 and the Parties made closing arguments on November 20, 2023. Because the date of the planned closure at issue in the relief requested is December 1, 2023, this Court is issuing this opinion and order without the benefit of a transcript of the evidence presented.

residents, a problem that is even more dire during the colder winter months. Notably, in June 2022, the Coordinated Homeless Outreach Center in Norristown, which served as the *only* 24/7, year-round homeless shelter for single adults in all of Montgomery County, closed its doors. "Although Montgomery County is providing a limited number of hotel stays in place of the Coordinated Homeless Outreach Center, the program has a lengthy waitlist, with most unhoused residents needing to wait approximately three to six months for emergency shelter." (ECF 4 at 3). Of more relevance to this Court, however, is Pottstown's residential zoning ordinance, which effectively prevents the presence of homeless shelters within the Borough.

The only sheltering option for unhoused people in Pottstown is a privately-run "warming center" program operated by Beacon of Hope, a church-based organization that has faced significant opposition from the Borough. Beacon of Hope's warming center is operated on a first-come first-served basis and only offered for overnights from November 1 through May 1. The warming center is not analogous to a shelter—unhoused residents may not remain in the warming center for more than 14 hours at a time overnight and must vacate during the day.

### *College Drive Encampment*

Due to the lack of affordable housing or emergency shelter in the Borough of Pottstown and Montgomery County, approximately 25 unhoused Pottstown residents were living in the woods adjacent to the Schuylkill River in Pottstown in an area known as the College Drive Encampment at the time Plaintiffs filed their Complaint. (ECF No. 1). The Borough claims that it became aware of the encampment following complaints from constituents using the Schuylkill River Path for recreation. In developing its plan to evacuate the encampment, the Borough subsequently contacted Access Services, a non-profit social services agency that provides assistance to unhoused Pottstown residents, and Beacon of Hope. These organizations, whose

initiatives will be discussed in further detail below, made it clear to the Borough that there would not be enough shelter space to house the residents of the encampment if the closure were to proceed.

According to the Borough, the College Drive Encampment is "located in a flood way, subject to FEMA requirements, making it vulnerable to severe flooding during extreme weather that could endanger persons and property." (ECF No. 15 at 2). Citing those safety concerns, Pottstown Manager Justin Keller testified that the Borough planned to go through with the closure despite its knowledge that there was not enough shelter space available.

In October 2023, the Borough began implementing its plan to close the College Drive encampment by placing yellow NO TRESPASSING warning signs around the area stating that "[y]ou are NOT permitted to enter or use this property . . . for any reason . . . such as to erect a tent, encampment or other structure, or to otherwise live, sleep, stay or store belongings on this property after December 1, 2023." (ECF No. 4 Exh. G). The yellow signs instruct residents to call 211 or the Montgomery County Mobile Crisis "[i]f [they] need help finding alternative shelter." The signs further state that "Beacon of Hope" will have shelter spaces available beginning November 1, 2023. Borough of Pottstown Police Chief Markovitch testified that that the Pottstown Police Department will cite the College Drive Encampment residents with criminal trespass after December 1, 2023 if the Pottstown Borough Council instructs it to do so.

### *Plaintiff Daniel Wanner*

Unhoused since 2022, Mr. Wanner has been sheltering in a "cobbled-together" tent at the College Drive Encampment since the summer of 2023. His disability prevents him from working, which has contributed to his inability to afford housing. He cannot access emergency shelter because there are not adequate shelter spaces available in or around Pottstown. Mr. Wanner

testified that if he were to be forced to relocate, his camping gear would likely not survive the transition because of how it is assembled. He explained to the Court that closure of the encampment would place him at greater risk of theft and crime and could push him further from the social services he receives in Pottstown. Prior to living at the College Drive Encampment, Mr. Wanner was forced to relocate multiple times from land located along the border of Pottstown and West Pottsgrove by Pottstown police officers. Since living at the College Drive Encampment, Mr. Wanner has been told by Pottstown law enforcement that he will be fined or arrested if he does not leave the encampment.

According to Mr. Wanner, most of the College Drive Encampment residents have fled as a result of the signs posted by the Borough of Pottstown. He testified that he believes only five or six residents remain. In fact, this Court struck the other unhoused Plaintiff, Alfredo Beltran, for purposes of this preliminary injunction, because by the time of his testimony in court, he had vacated the encampment and relocated to another lot of land nearby in Pottsgrove, of which the Borough has no jurisdiction. (ECF No. 22).

### *Beacon of Hope*

The evidence has shown that Beacon of Hope is the sole organization attempting to provide beds to the unhoused residents of Pottstown. As a result of the Borough's prohibition on homeless shelters, Beacon of Hope is only permitted to operate its limited warming center program during the winter months. This Court heard testimony from both Executive Director of Beacon of Hope, Thomas Niarhos, and Borough Manager, Justin Keller, regarding the manner in which Beacon of Hope will be permitted to operate during this season. Specifically, Beacon of Hope will be forced to rotate each month among five different churches pursuant to an informal agreement with the Borough. This coming January 2024, Beacon of Hope will operate its warming bed program out

of a church that only has 27 beds available, which "means that Beacon of Hope will need to turn away even more unhoused residents this upcoming winter than it did during the 2022-2023 winter." (ECF No. 4 at 5).

Thomas Niarhos, director of Beacon of Hope since 2020, provided this Court with some background on why the organization is forced to operate in such a peculiar manner this year. In November 2022, the Borough issued Beacon of Hope a cease-and-desist letter mandating closure of its warming bed program because it ran afoul of municipal zoning law. The following week, Pottstown Borough Council issued a press release defending the Borough's decision and elaborating on its overall position regarding homelessness, poverty, and revitalization in Pottstown. (ECF 4, Exh, E). The press release expresses the Borough's frustration with the lack of services provided by "[w]ealthier municipalities" in Montgomery County as well as a concern over the "influx of individuals from outside the region, who by their own admission, come [to Pottstown] because [it] is where the services are located." It goes on to say that this "transfer to Pottstown of challenges" has burdened its taxpayers, affected their "quality of life", and caused the Borough to become "inundated with non-profits."[2]

To date, Beacon of Hope has not been issued a zoning variance. Instead, through talks between the Borough and Beacon of Hope, this "work around" to the ordinance was hatched, allowing the warming center program to exist if it rotates churches every 30 days. Borough Manager Keller testified that it has and will continue to work with Beacon of Hope on the variance. While the press release and Keller's testimony tender that the Borough has made efforts to work collaboratively with Beacon of Hope and the other service providers, this Court finds quite the

---

[2] Despite his suggestion that the press release did not represent all voices on Council, Borough Manager Keller echoed the sentiment of the press release during his testimony.

opposite. After engaging with Access Services and Beacon of Hope about its plan to close the College Drive Encampment, there can be no doubt that the Borough was aware of the lack of shelter space available. Nevertheless, the Borough displayed signs directing encampment residents to Beacon of Hope and 211, which it knew would not have any ability to house these individuals.

## II.    ANALYSIS

Preliminary injunctions are "an extraordinary remedy" that "should be granted only in limited circumstances." *See Holland v. Rosen,* 895 F.3d 272, 285 (3d Cir. 2018). To succeed on this motion for preliminary injunction, Plaintiffs must demonstrate: (1) a reasonable likelihood of success on the merits; (2) irreparable harm to the Plaintiffs; (3) the denial of the preliminary injunction would injure the Plaintiffs more than the issuance of an injunction would harm the Borough; and (3) granting relief would serve the public interest. *Id.* at 286. The Third Circuit has termed the first two requirements as "gateway factors." *Reilly v. City of Harrisburg*, 858 F.3d 172, 179 (3d Cir. 2017). If Plaintiffs cannot meet their threshold showing on the gateway factors, this Court need not address the third and fourth factors. *Id.*

### A.    Likelihood of Success on the Merits

Plaintiffs argue that they have demonstrated a likelihood of success on the merits with respect to both their Eighth Amendment and Fourteenth Amendment claims. The Court addresses both in turn.

### *Eighth Amendment*

Plaintiffs have demonstrated a likelihood of success on the merits with respect to their Eighth Amendment claim insofar as the Borough's plan to close the College Drive Encampment involves the use of criminal sanctions. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S.

Const. amend. VIII. The prohibitions of the Eighth Amendment apply to the states through the due process clause of the Fourteenth Amendment. *See Robinson v. California,* 370 U.S. 660, 666 (1962).

The Cruel and Unusual Punishments Clause "circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it *imposes substantive limits on what can be made criminal and punished as such.*" *Ingraham v. Wright*, 430 U.S. 651, 667 (1977) (citations omitted) (emphasis added). The last limitation, the one at issue in this case, is "to be applied sparingly," as "the primary purpose of the Cruel and Unusual Punishments Clause has always been considered ... to be directed at the method or kind of punishment imposed for the violation of criminal statutes." *Id.* (alterations omitted) (quoting *Powell v. Texas*, 392 U.S. 514, 531–32 (1968) (plurality opinion)).

In 1962, the Supreme Court ruled in *Robinson* that laws criminalizing the "status" of narcotic addiction, as opposed to specific conduct, should "be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." 370 U.S. at 666. At issue in *Robinson* was a California statute making it a criminal offense to "be addicted to the use of narcotics" and required no proof of actual use of narcotics within the state's jurisdiction. *Id.* at 662, 666. The Court found that being addicted to narcotics was a "status or condition" akin to that of an illness; and analogized that "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.* at 666-667. *But see Powell v. Texas, 392 U.S. 514, 532* (1968) (plurality opinion) (explaining that a state statute punishing public intoxication was constitutionally permissible because it punished an act, "being in public while drunk on a particular occasion," not a status, "being a chronic alcoholic.")

The prohibition of status-based crimes under the Eight Amendment has since been applied to municipal actions targeting unhoused persons. *See Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019). In *Martin*, the City of Boise had enacted two local ordinances against "camping" and "disorderly conduct." *Id.* at 604-05. The "camping" ordinance made it a misdemeanor to use "public property as a temporary or permanent place of dwelling, lodging, or residence." *Id.* The "disorderly conduct" ordinance similarly banned "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private ... without the permission of the owner or person entitled to possession or in control thereof." *Id.* at 605. Combined, the ordinances essentially made it illegal to "simply sleep[] somewhere in public." *Id.* at 590 (Berzon, J., concurring).

In holding that Boise's ordinances were unconstitutional, the Ninth Circuit explained "that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Martin*, 920 F.3d at 616-17 (citing *Jones v. City of Los Angeles*, 444 F.3d 1118, 1134–35 (9th Cir. 2006), vacated, 505 F.3d 1006 (9th Cir. 2007)). The court noted that its opinion was narrow, premised on the condition that municipalities were only prohibited from enforcing bans on sleeping in public when "there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]." *Id.* at 617. "That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id.*

This Court agrees with the Ninth Circuit's application of the *Robinson* progeny to municipal actions that fundamentally punish the *status* of homelessness. Indeed, this case is strikingly similar to *Martin*. Boise, like the Borough, "[had] a significant and increasing homeless

population" and lacked sufficient shelter space to accommodate a substantial portion of its unsheltered population. 920 F.3d at 604. As is the case in the Borough, there were only three homeless shelters in Boise, all of which were operated by private, non-profit organizations. By way of further comparison, all three shelters in Boise had policies restricting admission and length of stay, as well as mandatory periods of time between stays. As was the case in *Martin*, the organizations providing services to unhoused people in Pottstown are unable to serve the entire homeless population.  Lacking access to shelter, the Borough's homeless community, like the unhoused people in Boise, turned to tents to shelter themselves.[3]

While this case does not involve an ordinance that directly criminalizes the status of homelessness, it is uncontroverted that the Borough of Pottstown has (1) categorically barred the existence of homeless shelters through its zoning code; and (2) plans to enforce the closure of the College Drive Encampment under the threat of criminal sanctions. The trespassing signs displayed by the Borough specifically target the encampment residents. Furthermore, the Borough is not offering any meaningful alternative shelter to the College Drive Encampment residents. So long as the unhoused residents of the encampment do not have a single place where they can lawfully or practically sleep within the Borough, the imposition of criminal sanctions for living, sleeping, or simply existing on Borough-owned land would effectively punish them for something for which they may not be convicted under the Eighth Amendment—that is, their status of homelessness.

---

[3] This Court notes that the two Eastern District of Pennsylvania decisions referenced in the Parties' briefs involved homeless encampments in the City of Philadelphia that were of a fundamentally different nature than the College Drive Encampment in Pottstown and the encampments at issue in *Martin*. The Philadelphia encampments in *Honkala* and *Murray* arose during the COVID-19 pandemic, when hundreds of activists and people experiencing homelessness occupied encampments at various sites around the city, advocating for permanent and affordable housing. While the Philadelphia encampments were undoubtedly a temporary place that unhoused people resided, they can be viewed as primarily protest encampments designed by housing activists to bring attention to homelessness and spur political change. There is no evidence that the encampment in the instant matter is organized around a political message—its residents are simply camping in the woods, trying to avoid detection and live with a level of dignity. More importantly, neither of these cases involved Eight Amendment claims. *See Honkala v. U.S. Dep't of Hous. & Urb. Dev.*, No. 21-0684, 2022 WL 282912 (E.D. Pa. Jan. 31, 2022); *Murray v. City of Philadelphia*, 481 F. Supp. 3d 461 (E.D. Pa. 2020).

Accordingly, the Court finds that the Borough's plan to enforce its evacuation of the encampment through criminal sanctions violates the Eighth Amendment ban against cruel and unusual punishment. *See also Joel v. City of Orlando*, 232 F.3d 1353, 1361 (11th Cir. 2000) ("A distinction exists between applying criminal laws to punish conduct, which is constitutionally permissible, and applying them to punish status, which is not."); *Phillips v. City of Cincinnati*, No. 1:18-CV-541, 2020 WL 4698800 (S.D. Ohio Aug. 13, 2020) (finding that Plaintiff sufficiently alleged an Eighth Amendment claim where the city had a policy and practice of criminalizing homelessness, destroying unhoused individuals' property, and banning homeless encampments, and where no shelter was available to these individuals); *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1564 (S.D. Fla. 1992) (finding that city's practice of arresting homeless persons for sleeping, standing, and congregating in public places violated Eighth Amendment).

### *Fourteenth Amendment*

The same cannot be said for Plaintiffs' Fourteenth Amendment claim, rooted in the state-created danger doctrine. Under the state-created danger doctrine, "liability may attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process." *Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013) (emphasis in original). To prevail on this theory, Plaintiffs need to demonstrate the following four elements:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* Plaintiffs argued that sweeping the College Drive Encampment "strips unhoused residents of the safety and security they achieve by banding together . . . increasing the likelihood of residents experiencing violence and crime." ECF 4-1. In addition, [i]t also obstructs Plaintiff Better Days Ahead's and Access Services' ability to provide College Drive Encampment residents with food, other life-sustaining supplies, and medical visits by dispersing residents and forcing agencies to find where each unhoused resident relocated." *Id.*

The unhoused residents of the College Drive Encampment will undoubtedly suffer hardships if forced to relocate, however this Court must conclude that Plaintiffs have failed to demonstrate the first element of a state-created danger claim. As the Third Circuit has explained, "[s]tate actors are not liable every time their actions set into motion a chain of events that result in harm." *Henry v. City of Erie*, 728 F.3d 275, 283 (3d Cir. 2013). To satisfy the "fairly direct" requirement of the first element, Plaintiffs must show that the Borough's "actions precipitated or were the catalyst for the harm for which the plaintiff[s] bring suit." *Id.* at 285 (alterations and internal quotation marks omitted). "Precipitate, in turn, means to cause to happen or come to a crisis suddenly, unexpectedly, or too soon." *Id.* (internal quotation marks omitted). Accordingly, "it is insufficient to plead that state officials' actions took place somewhere along the causal chain that ultimately led to the plaintiff's harm." *Id.* The record before the Court is void of any showing that the Borough's sweep of the encampment will be the direct cause for any harm Plaintiffs experience.

As Mark Boorse, Director of Program Development at Access Services testified, homelessness is inherently dangerous. The harms Plaintiffs assert the Borough will cause are too attenuated to satisfy the "fairly direct" requirement. In light of the record before the Court, it does not follow that a hypothetical attack on an unhoused resident or harm caused by the elements

would be the direct result of the Borough's closure of the encampment. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 909 (3d Cir. 1997) ("While we must accept the allegation that the attacker gained access to the building through the unlocked rear entrance, this does not mean the attack on Diane Morse occurred as a direct result of defendants allowing the construction crews to prop open the door."). Similarly, Plaintiffs have not shown that the Borough's closure would be the direct cause of any difficulty Better Days Ahead and Access Services experience in providing resources to the unhoused residents. Indeed, the unhoused residents' inability or unwillingness to notify service agencies of their new location could hinder Better Days Ahead and Access Services' ability to provide supplies to the unhoused residents. In addition, testimony bore out that the Borough has offered to store unhoused residents' survival gear—a resource service agencies often provide— until they complete their relocation.

Thus, the record simply does not support a conclusion that the Borough's closure would be the direct cause of the asserted harm, as required to satisfy the first element under Third Circuit precedent. Indeed, there are several intervening causes that could contribute to Plaintiffs' harm. "[T]he state-created danger doctrine provides a narrow path for establishing a due process violation," and in light of the foregoing, Plaintiffs have not sufficiently established a likelihood of success on the merits with respect to the state-created danger claim. *See Honkala v. U.S. Dep't of Hous. & Urb. Dev.*, No. 21-0684, 2022 WL 282912, at *10 (E.D. Pa. Jan. 31, 2022).

## B. Irreparable Harm

Next, the Court must examine whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. To establish irreparable harm, the Plaintiffs must demonstrate harm that "cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994). "More than a risk of irreparable harm must be

demonstrated." *Id.* at 655 (alterations and internal quotation marks omitted). Indeed, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Violations of constitutional rights "unquestionably constitute[] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity,* 950 F.2d 1401, 1412 (9th Cir.1991); *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007). This Court heard testimony from the Pottstown Police Chief indicating the Borough's intention to arrest residents for trespass violations after December 1, 2023. This Court is convinced that Defendant Borough of Pottstown will violate Plaintiffs' rights under the Eighth Amendment's ban on cruel and unusual punishment unless this Court intervenes. Standing alone, the use of criminal sanctions in conducting the encampment sweep is sufficient to find irreparable harm. This Court also recognizes that arrests and the collateral consequences of a criminal conviction only make it harder for homeless people to secure housing, find and maintain work, and access services. However, given the stringent test for irreparable harm, this Court hesitates to find that Plaintiffs have proven this element outside the Borough's proposals to criminalize the status of homelessness. To be sure, this Court heard testimony that unhoused Plaintiff Mr. Wanner is one of only five or six people remaining at the College Drive Encampment. Between the time the Borough displayed the no-trespassing signs, and when Mr. Wanner testified before this Court, most of the encampment residents had left. While there is little doubt that these people remain unhoused and unsheltered, Plaintiffs have not proven anything beyond a possible risk of harm posed by relocation.

Plaintiffs assert that the threat of arrest for trespass and sweeping of the College Drive Encampment will strip Plaintiffs and the other unhoused residents "of the safety and security, protection from crime, social connection, sense of community, and access to social services that they gain by banding together in encampments." (ECF 4-1 at 19). As discussed above, this Court has enjoined the Borough from arresting the College Drive Encampment's unhoused residents who cannot practically obtain shelter. And while the Court acknowledges the plight and difficult circumstances Plaintiffs and the other unhoused residents face, these circumstances amount to only a *risk* of irreparable harm. Plaintiffs have failed to make a clear showing that they will face *immediate* irreparable harm. Homelessness is inherently dangerous, and preliminary injunctive is inappropriate unless "[t]he preliminary injunction [is] the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). As such. it cannot be said that Plaintiffs will face immediate and irreparable harm due to the closure of the College Drive Encampment.

### C.  Balance of Hardship and Public Interest

This Court need only address the two remaining factors for the preliminary injunction test insofar as this Court is issuing a narrow enjoinment on the Borough's use of criminal sanctions to evacuate the College Drive Encampment. While the burden rests upon the moving party to make the first two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Acierno v. New Castle Cnty.,* 40 F.3d 645, 653 (3d Cir. 1994) (*quoting Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.,* 501 F.2d 917, 919–20 (3d Cir.1974).

This Court must weigh the harm a preliminary injunction might cause Defendant against the injury to the Plaintiffs. This Court finds that the balance of hardship also tips in Plaintiffs' favor on their Eighth Amendment claims. Without a preliminary injunction, Plaintiffs face a continued threat of citation, arrest, and prosecution. On its own, the threat of criminal sanctions is a hardship because enforcement of the ordinances against individuals that cannot practically obtain shelter violates their Eighth Amendment right to be free from cruel and unusual punishment. Practically speaking, the imposition of criminal sanctions also makes homelessness even harder to exit. Criminally sanctioning unhoused people creates further barriers to employment, housing, and access to services. The Borough has raised safety concerns about flooding on the Schuylkill banks, however, the Borough may still lawfully evacuate the site in a manner that does not run afoul of homeless people's Eighth Amendment rights. Moreover, entering a narrow injunction preventing the Borough from using criminal sanctions to close the College Drive Encampment is also in the public interest.  The public is not harmed by an injunction requiring basic constitutional protections for unsheltered persons who have nowhere to go. The Borough's apparent frustration with the "influx of homeless individuals" and lack of action by other municipalities in addressing homelessness does not release it from its obligation to respect unhoused people's rights and dignities.

## III.    CONCLUSION

This Court concludes that Defendant, Borough of Pottstown, may take steps to close the homeless encampment or require the unhoused residents to relocate from the College Drive Encampment—however, it may not do so through the imposition of criminal penalties. The record does not otherwise support a finding that Plaintiffs will suffer immediate and irreparable harm if the injunction, as requested, is not issued. An appropriate Order will follow.